In the

# United States Court of Appeals

### For the Seventh Circuit

No. 11-3246

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ROMAN OTTO CONAWAY,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Illinois.
No. 10 CR 30173—**David R. Herndon**, *Chief Judge*.

ARGUED JANUARY 12, 2012—DECIDED APRIL 16, 2013

Before EASTERBROOK, *Chief Judge*, and ROVNER and
TINDER, *Circuit Judges*.

ROVNER, *Circuit Judge.* In September 2010, Roman Otto
Conaway made a series of threatening phone calls to
an imam and numerous federal and state officials.
These calls culminated in a standoff at Conaway's home
that evening that drew a response from over a dozen
governmental agencies and resulted in the evacuation of
the entire street. Thankfully Conaway's threats to, among

other things, blow up the entire block turned out to be bogus—an ominous-looking device strapped to his chest held squares of putty, not explosive C-4. He was sentenced to two concurrent sentences of 60 months' imprisonment after pleading guilty to making false threats to detonate an explosive device, *see* 18 U.S.C. § 1038(a)(1), and influencing a federal official by threat, *see* 18 U.S.C. § 115(a)(1)(B). He argues on appeal that his 60-month sentences are both procedurally and substantively unreasonable in light of his crime and what he views as mitigating factors that the district court failed to adequately consider. For the reasons that follow, we affirm.

# I.

Conaway's elaborate plot came on the heels of a widely publicized threat by Terry Jones, a Gainesville, Florida pastor, to burn 200 copies of the Quran on the 2010 anniversary of the September 11 terrorist attacks. Jones abandoned his plan (temporarily at least) in the face of international protests and intense pressure from governmental and religious leaders—including a personal phone call from Defense Secretary Robert Gates. Conaway set his own plan in motion just ten days later on September 21, 2010 with a page from Jones's playbook: he posted on Facebook his plans to burn the "holy quaran" (sic) and invited anyone with a camera or video camera to witness the event at his home address, also posted on Facebook.

Conaway then began making phone calls, repeating his threats to burn the Quran and also threatening other

acts of violence. He first called the imam of a St. Louis-area mosque and told him the following: (1) that he planned to videotape himself burning the Quran that night and distribute it to three television channels; (2) that he wanted to start a war between Christians and Muslims; (3) that he planned to kill President Obama and other government officials to start the war; (4) that he intended to start "an apocalypse" and "end the war in Afghanistan which fucking Bush started"; (5) that Terry Jones had caved on his plan to burn the Quran on account of threats from President Obama; and finally, (5) that he wanted "Kim Jong-il to have some pain and cry." The imam promptly called the FBI to report Conaway's threats. Conaway then repeated these threats or variations of them in a series of phone calls. Specifically, he called the offices of the Illinois Attorney General, Congressman John Shimkus, the U.S. Department of State, and the White House. When calling the White House, he requested that President Obama call him, just as Secretary Gates had called Pastor Jones.

Not surprisingly, federal agents responded swiftly to Conaway's bevy of threats. At approximately 7 p.m. that evening, two FBI counterterrorism agents, a member of the Secret Service, and a local patrolman parked down the street and approached Conaway's home. Shortly thereafter, Conaway appeared in the doorway putting on a belt of some kind, wearing what appeared to be a suicide vest, and holding something that looked like a detonator. The belt had wires extending from it that attached to a curling iron. He stormed angrily into the front yard and began shouting that he had a bomb

capable of blowing up the entire block. Federal counter-terrorism agent John Kelly, who testified at Conaway's sentencing hearing, retreated with the other agents to assess the situation and call for backup.

Agent Kelly then returned and began negotiating with Conaway, a process that spanned seven hours. In the course of the standoff, Conaway persuaded his wife and adult son to stand on either side of him to act as a "shield." During the course of those negotiations, Conaway told agents that the wires attached to his detonation device were connected to 55-gallon drums (two in the front yard and one behind the house) containing combustible chemicals. He demanded that both the media—Channel 5 news, in particular—and the imam from St. Louis be brought to his house. When these demands were not met, he would begin a "countdown" from ten as if he intended to detonate his explosive device upon reaching zero. In addition to the occasional dramatic countdowns, Conaway repeatedly threatened to blow up himself, agents and officers at the scene, and anyone else in the vicinity.

Predictably, the governmental response to Conaway's threats and the ensuing standoff was immense. All told, at least fifteen state and federal agencies[1] were present

---

[1] The responding agencies were as follows: Red Cross, St. Clair Special Emergency Services, Metro Air Support, Caseyville police, O'Fallon police, French Village fire, Fairview Heights police, Fairview Heights fire, Illinois Emergency Management

(continued...)

at the scene and well over 100 individual state and federal law enforcement agents. The entire street was evacuated to a church several blocks away. It was also necessary to set up a command center and establish a perimeter around the area to redirect both foot and vehicle traffic. A SWAT team was also deployed to the woods behind Conaway's home to enforce the perimeter there and prevent anyone from approaching the home from behind.

Ultimately Conaway surrendered, at which point it became apparent that the entire thing had been an elaborate hoax. At some point in the negotiation process, Conaway agreed to allow his wife and son to leave. When Conaway realized that neither the media nor the imam would be coming, he eventually surrendered in exchange for the promise of a psychiatric evaluation and two cigarettes. The mesh belt Conaway wore contained blocks of inert putty molded to resemble bricks of C-4 explosive. In the backyard Conaway had placed a new Quran atop his barbecue grill next to a gasoline can and matches. There were also wires running from the grill to a 55-gallon drum nearby.

After he surrendered, Conaway was interviewed by Special Agent Richard Box, who testified about that

---

[1] (...continued)

Agency, Illinois Secretary of State Bomb Squad, Illinois State Police, Metropolitan Enforcement Group of Southwestern Illinois, Illinois Law Enforcement Alarm System Tactical Response Team ("ILEAS"), St. Clair County Sheriff, and ILEAS Weapons of Mass Destruction Team.

interview at sentencing. During the interview, Conaway explained that earlier that day his daughter and grand-children had received an order of protection against him in Illinois state court. He told Agent Box that he believed by strapping a bomb to himself he may get an audience with Illinois Attorney General Lisa Madigan, which would allow him to air his complaints about the allegedly dysfunctional St. Clair County judicial system. The transcript from the St. Clair County proceedings reflects that when Conaway was asked to respond to his daughter's request for an order of protection, he stated, "Well, as far as the order of protection, Your Honor, I don't care if she takes it for life." Conaway also told Agent Box that the Florida pastor, Terry Jones, had stolen his idea to burn the Quran and gotten the media attention Conaway should have received. Conaway also explained that he wanted to burn the Quran to "piss off Muslims" so that they would strike Illinois first in the would-be apocalyptic war between Christians and Muslims. Finally, Conaway admitted that he was "anti-government" and that he had threatened to "kill cops" because he did not care (at that point) if he died. Notwithstanding this, he also allowed that he "made [his] wife and son stick around because [he] needed them to shield [him]." Agent Box also testified that Conaway was deeply apologetic for his behavior and that he expressed relief that the incident was over.

Conaway ultimately pleaded guilty to one count of making false threats with an explosive device, *see* 18 U.S.C. § 1038(a)(1), and one count of influencing a federal official by threat, *see* 18 U.S.C. § 115(a)(1)(B). The district court concluded over Conaway's objection that

several upward adjustments were applicable to his base-offense level: two levels because the offense involved more than two threats, U.S.S.G. § 2A6.1(b)(2); six levels because the offense was motivated by the official status of the victim, *id.* at § 3A1.2(b); and four levels for the substantial disruption of governmental services, *id.* at § 2A6.1(b)(4). After applying a three-point reduction for acceptance of responsibility and calculating Conaway's criminal history category of I, the district court arrived at a guideline range of 46 to 57 months. Conaway requested a below-guidelines sentence of 30 months, based primarily on his mental health problems and their role in his offense. The government, for its part, recommended a sentence of 50 months—in the middle of the advisory guideline range.

After considering the sentencing factors in 18 U.S.C. § 3553(a)[2] and hearing argument from the government, defense counsel, and Conaway himself, the district

---

[2] The factors for the court's consideration under § 3553(a) include the following:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed—(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed education and vocational training, medical care, or other correctional treatment in the most effective manner[.]

18 U.S.C. § 3553(a)

court imposed a term of 60 months' imprisonment. The court noted that in terms of seriousness, Conaway's crime was at the "upper scale of criminal events," along the lines of a domestic terrorism incident. The court also concluded that Conaway's actions throughout the standoff and during the interviews afterward demonstrated his awareness of both the criminality and the wrongfulness of his actions. Finally, the court noted that Conaway had a history of threatening behavior that had, if anything, escalated as he had aged. Conaway appeals.

## II.

Conaway argues that his sentence is both procedurally and substantively unreasonable. Our review of the reasonableness of a sentence is twofold. First, we assess whether the sentence is procedurally reasonable. Specifically, we ask whether the court properly calculated the guidelines range, appropriately analyzed the § 3553(a) factors, accurately assessed the underlying facts, and sufficiently explained the sentence and any justification for deviating from the recommended advisory guideline range. *See*, *e.g.*, *United States v. Brown*, 610 F.3d 395, 397 (7th Cir. 2010). We next consider whether the sentence is substantively reasonable. This review is deferential. Within-guidelines sentences are afforded a presumption of reasonableness. Although there is no such presumption for sentences outside the range, they are nonetheless reviewed deferentially. *See United States v. Parr*, 545 F.3d 491, 505 (7th Cir. 2008)

(stating that "review of a nonguideline sentence is extremely deferential").

Conaway first maintains that the district court erroneously applied U.S.S.G. § 3A1.2. Subsections (a) and (b) of that section instruct the court to increase the offense level by six total levels if the offense was motivated by the fact that the victim was a government officer or employee and the underlying offense was an offense against the person from Chapter Two of the guidelines. As relevant here, the application note to § 3A1.2 explains that the adjustment applies when "the offense of conviction was motivated by the fact that the victim was a government officer or employee." *Id.* cmt. n.3. We review the district court's factual findings supporting an adjustment only for clear error. *United States v. Pellman*, 668 F.3d 918, 926 (7th Cir. 2012). We review de novo its judgment that the facts support the adjustment. *Id.*

At sentencing, Conaway argued that § 3A1.2 was inapplicable because his threats were simply "a general harangue against anybody and everybody," as opposed to anything designed to target law enforcement. The district court disagreed, finding specifically that Conaway's entire elaborate plan hinged on the appearance of law enforcement at his residence to enable him to "put on the show." The court also concluded that Conaway's claim that he was indifferent to who was on the receiving end of his threats ran "counter to the evidence," which showed that it was clearly part and parcel of his plan to draw in law enforcement with his bomb hoax.

We see no error in the factual findings of the district court. The record amply demonstrates that from the time Conaway set his plan in motion—with Facebook posts and phone calls to top-level state and federal officials—he anticipated a response from law enforcement. When that response came, he escalated his behavior with continuing threats and occasional countdowns to a supposed bomb detonation. This demonstrates that Conaway was "motivated" by the fact that his victims were government officers and not simply bystanders on his block, whom he could have threatened without an elaborate plan to draw countless state and federal agencies to his home using incendiary threats to kill President Obama and incite violence against Muslims.

Conaway, however, argues that the order of protection entered against him earlier that day in state court was actually what "motivated" his crime. He shores up his argument with Agent Box's testimony at sentencing, wherein he agreed with Conaway's counsel that it was fair to say that the order of protection was a "triggering event" for the incident. It may well be that Conaway was disgruntled with the Illinois state court system and upset over the order of protection, but this fails to undermine the evidence that he clearly sought out government officers or employees as the victims, so to speak, of his threats. That he may have been motivated to act by his frustration with the order of protection in no way changes the facts found by the district court: that he acted with the intention of bringing law enforcement officials to his home so that he could make his

threats to blow up both them and the surrounding block. Moreover, the record demonstrates that several days *before* the state court hearing, Conaway opened a new Facebook account to use for posting his threats to burn the Quran. There is thus ample evidence from which to conclude that garnering media attention and luring in law enforcement to respond to his threats motivated his crime at least as much as any anger over the order of protection. And while he may have believed all of this was the way to draw attention to his frustration with the Illinois court system (a problem he made little mention of during the seven-hour standoff), the district court did not clearly err by concluding that Conaway targeted law enforcement officials as a means to whatever end he had in mind. *See United States v. Suarez*, 225 F.3d 777, 779 (7th Cir. 2000) (reiterating that district court's choice between two competing factual scenarios cannot be clearly erroneous). Thus, the six-level official victim adjustment under § 3A1.2 was appropriate. *Cf. United States v. Williams*, 520 F.3d 414, 424 (5th Cir. 2008) (concluding that official victim adjustment applied to prison inmate who claimed that assault of prison guard was motivated by guard's having touched him inappropriately as opposed to his official status).

Conaway next contends that his sentence three months above the advisory guideline range is substantively unreasonable. We have noted that " '[t]he farther the judge's sentence departs from the guidelines . . . the more compelling the justification based on factors in section 3553(a) that the judge must offer in order to

enable the court of appeals to assess the reasonableness of the sentence imposed.'" *United States v. Courtland*, 642 F.3d 545, 550 (7th Cir. 2011) (quoting *United States v. Dean*, 414 F.3d 725, 729 (7th Cir. 2005)). More recently we have clarified that the question of how much "farther" a sentence is from a recommended range is to be considered in relative, rather than absolute, terms. *See United States v. Castillo*, 695 F.3d 672, 673 (7th Cir. 2012). Here, the district court's sentence of three months above the upper advisory range is fairly minor in both relative and absolute terms.

Conaway, however, argues that given his well-established history of mental illness, a sentence *below* the advisory guideline range was appropriate and that certainly anything *above* that range is unreasonable. Specifically, Conaway maintains that a Bureau of Prisons ("BOP") competency evaluation and an evaluation prepared at his request by Dr. Daniel J. Cuneo both contain findings suggesting he suffered from diminished mental capacity such that a reduced sentence would be appropriate. The BOP evaluation concluded that he suffered from an "adjustment disorder with mixed anxiety and depressed mood," "rule-out sedative/anxiolytic abuse," and "rule-out paranoid personality disorder (with antisocial traits)." Dr. Cuneo diagnosed Conaway with bipolar disorder, paranoid personality disorder, and "sedative/anxiolytic abuse by history" and "caffeine intoxication by history." Conaway also makes much of Dr. Cuneo's opinion that Conaway's mental illness "was one of the major factors contributing to his actions at the time of the alleged offense."

In the district court, Conaway argued that a lower sentence was appropriate under U.S.S.G. § 5K2.13. That section recognizes that a reduced sentence ("departure" in mandatory guidelines era language) may be warranted if "(1) the defendant committed the offense while suffering from a significantly reduced mental capacity; and (2) the significantly reduced mental capacity contributed substantially to the commission of the offense." U.S.S.G. § 5K2.13. As relevant here, section 5K2.13 further provides that such a reduction is inappropriate if the reduced mental capacity was caused by voluntary use of drugs or other intoxicants or if either the offense itself or the defendant's criminal history indicates that there is a need to protect the public. *Id.* Conaway also argued generally that the court should consider his diminished mental capacity as a mitigating factor in his history and characteristics under § 3553(a)(1). *See United States v. Durham*, 645 F.3d 883, 898 (7th Cir. 2011) (pointing out "important" distinction between diminished capacity under § 5K2.13 and personal characteristics that may be either aggravating or mitigating factors).

The government on appeal focuses largely on Conaway's ineligibility for a reduced sentence under § 5K2.13, despite the fact that he has largely dropped his arguments under § 5K2.13. Given the factual findings below and the nature of Conaway's offense, it is unsurprising that he abandons this angle on appeal. Factually, the district court found that Conaway "was clearly aware that his actions were criminal in nature and wrongful in every respect, and he clearly through-

out this entire event demonstrated control." This finding is supported by the record. First, Conaway's own expert, Dr. Cuneo, concluded his report with the observation that Conaway did "know that threatening federal officials is against the law [and that] . . . threatening to detonate a bomb and threatening the president is wrong. He could have controlled his behavior if he so desired." Secondly, Agent Kelly testified that he perceived Conaway's mental state during the standoff to be "very clear." Agent Box, who interviewed Conaway following his surrender, recounted that Conaway repeatedly expressed remorse, told Agent Box that he knew the difference between right and wrong, and seemed "very coherent." Taken together, this evidence supports the district court's rejection of Conaway's assertion that diminished mental capacity contributed significantly to his commission of the offense. Likewise, the nature of the offense itself and Conaway's history lend credence to the district court's conclusion that it was important to protect the public from Conaway. *See* U.S.S.G. § 5K2.13 (stating that court may not depart below guideline range if facts of offense suggested need to protect public from defendant because offense involved actual violence or the threat of violence).

That leaves Conaway's claim that the district court failed to properly consider his mental illness when evaluating his history and characteristics under § 3553(a). Specifically, Conaway claims that the district court failed to adequately account for the overwhelming evidence that his mental illness contributed to the offense and simultaneously overemphasized what the court

described as Conaway's "threatening" behavior in the past. He argues that the district court's weighing of the various § 3553(a) factors—specifically the overemphasis and exaggeration of his past behavior and underemphasis of his mental illness—strayed impermissibly outside "'the bounds of reason.'" *See United States v. Busara*, 551 F.3d 669, 674 (7th Cir. 2008) (noting that district court may weigh sentencing factors accordingly within "'the bounds of reason, which are wide'") (quoting *United States v. Johnson*, 471 F.3d 764, 766 (7th Cir. 2006)).

Our review focuses on whether the district court adequately explained its rationale for the chosen sentence and whether that sentence is fairly grounded in the § 3553(a) factors. *See Gall v. United States*, 552 U.S. 38, 50 (2007); *Busara*, 551 F.3d at 674. When sentencing outside the advisory guideline range, the judge must provide an explanation that articulates and justifies the magnitude of the variance. *See Gall*, 522 U.S. at 50; *United States v. Miller*, 601 F.3d 734, 739 (7th Cir. 2010).

Although Conaway disagrees with the conclusions the district court reached, it is clear from the record that the court adequately considered his mental illness and explained why it nonetheless imposed a sentence slightly above the advisory range. The court specifically noted each of the § 3553(a) factors and also noted that it had read Conaway's sentencing memormandum and its addendum "actually a couple of times." The judge also stated that he considered Conaway's diminished mental capacity argument "very carefully." Despite its

finding that Conaway may have "diminished capacity in some respects," what struck the court when it came to his character and history was Conaway's penchant for "threatening behavior, aggressive behavior, [and] anti-government behavior." This behavior included, among other things, calling a woman repeatedly and threatening to blow her head off and fire bomb her home, threatening to sue everyone involved in recouping funds on bad checks he wrote, threatening to "take some people out and get off by pleading insanity" when he was investigated for allegedly abusing his grandchildren, and getting barred from a casino after kicking a machine.

Conaway insists that the court overstated these past incidents, which he characterizes as boiling down to "angry threats of bodily harm over the phone 30 years ago, threatening to 'sue everyone' after being prosecuted for bad checks 14 years ago, and death threats over ten years ago after his children were taken away." But the court was within its discretion to view the current crime as a continuation of the sort of angry, threatening behavior Conaway had displayed repeatedly in the past. The court carefully considered Conaway's various arguments and painstakingly explained why it believed the "extreme" nature of his bomb hoax warranted a sentence above the advisory guideline range. The court also discussed mitigating factors such as Conaway's work history, his efforts to assist with other cases after his arrest, and his timely plea.

The facts of this case are distinguishable from those in *United States v. Miranda*, 505 F.3d 785 (7th Cir. 2007),

upon which Conaway relies heavily. The defendant there suffered from persistent delusions and hallucinations and was in fact experiencing auditory command hallucinations telling him that "we need money" at the time he robbed a bank. *Id.* at 789. Although the evaluations by both the BOP doctor and Dr. Cuneo reflect diagnoses of mental disorders, neither doctor opined that Conaway was unaware of reality or unable to control or understand his behavior. The sentencing transcript here demonstrates that the district court considered these reports and took into account Conaway's psychological difficulties. The court simply concluded that it was appropriate to assign more weight to the extraordinary nature of the crime and the need to protect the public from what it viewed as Conaway's escalating pattern of menacing behavior. *See Busara*, 551 F.3d at 647 ("[I]t is perfectly acceptable for courts to assign varying weights to the [§ 3553(a)] factors as they deem appropriate in the context of each case."). This was not an abuse of the district court's discretion.

## III.

For the foregoing reasons, we AFFIRM Conaway's convictions and sentences in all respects.