In the

# United States Court of Appeals

## For the Seventh Circuit

No. 14-2764

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

CHRISTOPHER BOULTINGHOUSE,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Southern District of Indiana, Evansville Division.
No. 3:06-cr-00007-RLY/WGH— **Richard L. Young**, *Chief Judge.*

ARGUED FEBRUARY 9, 2015 — DECIDED MAY 4, 2015

Before ROVNER, SYKES, and WOOD,[*] *Circuit Judges.*

ROVNER, *Circuit Judge.* At the conclusion of a hearing at
which defendant-appellant Christopher Boultinghouse waived
his right to representation by counsel, the district court found
that Boultinghouse had violated multiple conditions of his

---

[*] The Honorable Andrea R. Wood, of the Northern District of Illinois,
sitting by designation.

supervised release, revoked that release, and ordered him to serve an additional prison term of 24 months. Boultinghouse appeals, contending that the district court did not do enough to ensure that his decision to proceed without the assistance of counsel at the revocation hearing was sufficiently informed to constitute a knowing waiver, and that the court failed to articulate reasons for the sentence it imposed when it revoked his supervised release. We conclude that the totality of the circumstances, including the district court's colloquy with Boultinghouse regarding his decision to proceed pro se, demonstrates that his waiver of representation by counsel was a knowing and intelligent decision as well as a voluntary one. As to the sentence, however, because the court gave no reasons for the term of imprisonment it imposed, we cannot be sure that it considered the statutory sentencing factors as it was required to do; we are therefore compelled to vacate the judgment and remand for resentencing.

## I.

In 2006, a grand jury indicted Boultinghouse on two counts of unlawfully possessing a firearm in interstate commerce after previously having been convicted of a felony offense. *See* 18 U.S.C. § 922(g)(1). Boultinghouse pleaded guilty to both counts of the indictment, and the district court ordered him to serve a prison term of 77 months, to be followed by a three-year term of supervised release. By October of 2011, Boultinghouse had completed his prison term and commenced his supervised release.

On July 21, 2014, Boultinghouse's probation officer filed a petition with the district court asking that Boultinghouse be

arrested and that the court revoke his supervised release. The petition alleged that Boultinghouse had failed multiple drug tests in April and May, 2014. In addition, on June 9, 2014, sheriff's deputies in Posey County, Indiana, had arrested Boultinghouse and charged him with the misdemeanor offenses of disorderly conduct and intimidation; but Boultinghouse had not reported the arrest to his probation officer as required. Based on these facts, the officer contended that Boultinghouse had committed five separate violations of the conditions of his supervised release, namely: (1) committing another criminal offense, (2) using a controlled substance, (3) frequenting a place where controlled substances are illegally sold, used, distributed, or administered, (4) unlawfully possessing a controlled substance, and (5) failing to promptly inform his probation officer that he had been arrested.

Boultinghouse was arrested pursuant to a bench warrant and appeared before the court on July 25, 2014, without counsel. The court advised Boultinghouse that he was entitled to representation and asked him if he wanted counsel. Boultinghouse replied that he did not. "I can defend myself," he told the court. R. 21 at 5. The following exchange between the court and Boultinghouse ensued:

> THE COURT: All right. You understand that you would be held to the same standards that an attorney would be held to?
>
> THE DEFENDANT: Sure.

THE COURT:          Okay. All right. I've got to
                    tell you, though, that it's not
                    a wise decision you're mak-
                    ing here.

THE DEFENDANT:  I'm well aware of the fool-
                    for-a-client deal, Your Honor,
                    but this is going to be pretty
                    simple.

R. 21 at 5. The court proceeded to review with Boultinghouse each of the charged violations of his supervised release to make sure that he understood them; Boultinghouse, after asking clarifying questions about several of the charges, indicated that he did. The court then advised Boultinghouse that he had a right to a hearing on the petition for revocation, assuming that he denied the allegations contained therein. Boultinghouse responded that he did deny the allegations "categorically," and he further advised the court that he "would like a hearing as soon as possible." R. 21 at 10. After the government informed the court that it was prepared to proceed immediately as to all but the first charged violation (commission of another offense), the court decided to proceed with the hearing forthwith.

Early on in that hearing, the court noted for the record that it had summoned an experienced criminal defense attorney to the courtroom to serve as stand-by counsel for Boultinghouse. The court urged Boultinghouse to consult with that attorney as he wished. Boultinghouse acknowledged the court's invitation.

The government called Boultinghouse's probation officer, Robert DeCarli, as its first and only witness. After confirming

that he had reviewed with Boultinghouse at the commencement of his supervised release each of the conditions of release underlying the charged violations, DeCarli recounted the facts underlying the revocation petition.

With respect to the unreported arrest, DeCarli testified that he had eventually received a report from the Federal Bureau of Investigation's National Crime Information Center indicating that Boultinghouse had been arrested in Posey County, Indiana, on June 9, 2014, for disorderly conduct and intimidation. Boultinghouse had not disclosed this arrest to him within 72 hours, as the conditions of his supervised release required him to do, nor had he mentioned it at an in-person meeting with DeCarli that took place on June 18, 2014.

DeCarli indicated that the drug use, possession, and frequenting charges were based on a succession of positive urinalysis results from Boultinghouse in April, May, and June 2014. DeCarli had personally supervised each of the urine "drops" that Boultinghouse submitted on these occasions. He explained that in each instance, he followed the same procedure employed with respect to the collection of all such specimens for testing. DeCarli would prepare a standard chain of custody form, have Boultinghouse complete the donor certification and consent portion of the form, write Boultinghouse's initials on a seal used to secure the specimen, and then place his own signature on the seal. After the urine sample was collected, Boultinghouse would affix the seal to the container and drop it into an evidence bag, which was then sealed in front of him.

Boultinghouse failed the first of four narcotics tests on April 10, 2014. That test indicated positive results for both marijuana and methamphetamine. According to DeCarli, Boultinghouse admitted to having used both drugs approximately five days earlier. When DeCarli had Boultinghouse submit another sample on May 5,[1] he again tested positive for both marijuana and methamphetamine; and DeCarli testified that Boulting-house again admitted to having used both drugs. Repeat testing one week later produced a positive result for marijuana alone, and Boultinghouse confessed to marijuana use, accord-ing to DeCarli. DeCarli recalled that after the two positive test results in May, he offered Boultinghouse the opportunity to undergo substance abuse treatment but that Boultinghouse declined the offer on both occasions. Finally, a June 26 analysis again yielded a positive result for marijuana; but Boulting-house denied marijuana use prior to this test. By this time, DeCarli had also become aware of Boultinghouse's June 9 arrest in Posey County.

At this juncture, DeCarli testified, he advised Boultinghouse that something had to be done in view of the (unreported) arrest and multiple positive drug tests. "The minimal option," DeCarli told Boultinghouse, was to ask the court to modify the conditions of his release to include place-ment in a halfway house for a period of up to 180 days. R. 21 at 21-22. DeCarli testified that Boultinghouse had initially consented to the proposal, agreed to waive his right to a

---

[1]  DeCarli testified that whereas traces of methamphetamine are typically eliminated from the body within three days of use, it may take up to 30 days for evidence of marijuana use to dissipate.

hearing on this proposed modification, and signed a waiver. *See* R. 5-1. DeCarli had then filed a petition with the district court seeking the modification. *See* R. 5. But Boultinghouse evidently had experienced a change of heart, and several days later, he had filed a pro se, emergency motion seeking to have DeCarli removed from his case or to terminate his supervised release.[2] Once DeCarli had became aware of Boultinghouse's motion, he had filed the petition to revoke Boultinghouse's supervised release, triggering the hearing that is the subject of this appeal. *See* R. 9.

DeCarli's direct examination concluded with his recommendation that Boultinghouse's supervised release be revoked and that he be incarcerated for a period of 21 months (the minimum term recommended by the applicable policy statement of the Sentencing Guidelines) with no additional supervision to follow.

Before the cross-examination of DeCarli commenced, the court revisited the matter of Boultinghouse's representation:

> THE COURT:    Mr. Boultinghouse, you have an opportunity to ask questions of Mr. DeCarli.

---

[2] The motion, which was supported by Boultinghouse's affidavit, alleged, *inter alia*, that DeCarli had been forging Boultinghouse's initials on the urine specimens, that the test results indicating drug use were inaccurate, and that, contrary to DeCarli's allegation, he had timely reported his arrest in Posey County to DeCarli. *See* R. 6 & 6-1. Boultinghouse argued that DeCarli was no longer credible and that, at a minimum, the court should have DeCarli removed from the case.

THE DEFENDANT:   Yes.

THE COURT:   And again I advise you to have counsel here.

THE DEFENDANT:   I understand, sir.

THE COURT:   Counsel understands—experienced counsel such as Mr. Keating [the attorney the court had summoned as stand-by counsel] understands how to ask questions, understands the rules of evidence, and these are penalties, as you've just heard, of 21 months—

THE DEFENDANT:   Very serious.

THE COURT:   —incarceration at the Bureau of Prisons, so I can't emphasize enough the importance of you being represented by competent counsel.

And so do you wish to have Mr. Keating?

THE DEFENDANT:   No, sir. He doesn't understand or know my case—

THE COURT:   All right.

THE DEFENDANT:   —not like me.

| | |
|---|---|
| THE COURT: | All right. I'll find, then, that you knowingly and voluntarily waive your right to counsel and permit you to go ahead. |

R. 21 at 23-24.

Boultinghouse proceeded with his cross-examination of DeCarli, and it is fair to say that the examination was as amateurish as it was short. He began by suggesting that DeCarli had falsely represented to the court that he had violated the terms of his release by committing another crime, given that the charges of creating a public disturbance and intimidation were still pending in state court.[3] The district court had to admonish Boultinghouse that cross-examination was a time for questions, not argument. R. 21 at 26. Boultinghouse moved on to the drug-related violations, and he did manage to extract an important concession from DeCarli when he asked his probation officer what evidence there was that he had frequented a place where controlled substances were illegally distributed: DeCarli replied that Boultinghouse had tested positive for narcotics use; DeCarli added that three drug-related violations with which Boultinghouse was charged (use, possession, and frequenting) were standard allegations that his office pursued when a supervisee tested positive for drug use. R. 21 at 27. Boultinghouse thus did manage to make

---

[3]    We note that when Boultinghouse raised the subject of the charges pending in Indiana state court, the district judge warned Boultinghouse that any statements he made regarding those charges could be used against him. R. 21 at 24-25.

clear to the court that these violations were based on the positive test results and nothing more. At this point, Boultinghouse informed the court that he wished to proceed with argument, and the court excused DeCarli from the witness stand.

When the court advised Boultinghouse that he had a right to present his own evidence at the hearing, Boultinghouse reminded the court that he had submitted his own sworn affidavit to the court in support of his previously-filed request to have DeCarli removed from his case. The court located the affidavit and then recited its contents. Boultinghouse averred that (1) he had not abused, ingested, or taken any illegal drugs since before August 16, 2005; (2) at no time during his supervised release had he initialed the seal upon any urine specimen collected by DeCarli for analysis; (3) he had not been allowed to read any document that DeCarli had given him to sign, and he had been forced to sign such documents under protest and duress; (4) he had informed DeCarli by telephone of his arrest in Posey County within 72 hours as required; and (5) he was afraid of DeCarli and believed that DeCarli was attempting to have him incarcerated in an illegal and procedurally defective manner. R. 21 at 30; *see* R. 6-1. The court asked Boultinghouse whether he had anything to add to his affidavit, and Boultinghouse said that he did not. The court also confirmed that Boultinghouse had no additional evidence to present.

Under questioning by the government, Boultinghouse stated that he had filed his request to remove DeCarli (and supporting affidavit) after his meeting with DeCarli on June 26, when DeCarli advised him that he would seek to have him

arrested in view of the multiple violations of the conditions of his release.

In response to additional questions posed by the court, Boultinghouse acknowledged that he had initialed and signed the urinalysis chain of custody forms. But Boultinghouse told the court that he had done so under duress. When asked for a second time whether he had any other evidence to present, Boultinghouse said that he did not.

The parties made their final arguments. The government argued that DeCarli's testimony established by a preponderance of the evidence that Boultinghouse had failed multiple drug tests and thus was guilty of each of the alleged drug violations, and that he had also failed to report his arrest on the public disturbance and intimidation charges to DeCarli. The prosecutor urged the court to impose a sentence of 24 months. For his part, Boultinghouse contended that DeCarli's testimony could not be accepted as truthful. With respect to his Posey County arrest, Boultinghouse renewed his contention that because he had not yet been convicted of anything in state court, DeCarli's allegation that he had committed another criminal offense amounted to perjury. As to the narcotics charges, Boultinghouse argued that the chain of custody on the urine specimens resulting in the reports of drug usage was defective, because he himself had not initialed the seal on each specimen (recall DeCarli's testimony that he rather than Boultinghouse had initialed the seals), which Boultinghouse asserted was in violation of an unspecified federal regulation. Relatedly, Boultinghouse contended that DeCarli had fraudulently represented to the government's laboratory that the chain of custody on the specimens was sound. In sum, DeCarli

had no credibility, Boultinghouse argued. "He's committed perjury on … the petition itself, and he's been forging my signature and committing chain-of-custody fraud the whole time … ." R. 21 at 41.

The district court found that the government had established four of the five charged violations of Boultinghouse's supervised release terms. The court noted that the conflicting accounts given by DeCarli and Boultinghouse called for a credibility determination. "The court finds that the testimony given by Mr. DeCarli is very credible testimony. I have no reason not to believe that." R. 21 at 43. The court thus credited DeCarli's testimony that Boultinghouse had admitted to using both methamphetamine and marijuana in April and May, 2014. Based on those admissions and the positive test results that DeCarli had reported, the court found that each of the charged narcotics violations (2, 3, and 4) was true. The allegation that Boultinghouse had failed to report his arrest likewise (charged violation number 5) came down to a question of credibility (Boultinghouse stated in his affidavit that he had, in fact, told DeCarli about the arrest) and, here again, the court credited DeCarli on this point, and thus found that this violation had been proven. As the government had presented no evidence as to the allegation that Boultinghouse had committed another criminal offense (charged violation number 1), the court made no finding as to this alleged violation.

Without further ado, the court proceeded to the penalty phase of the hearing. The more serious of the violations (those involving the use and possession of narcotics) were Grade B violations under the Sentencing Guidelines, and Boultinghouse had a criminal history category of VI. The pertinent Guidelines

policy statement as to imprisonment recommended a sentence within the range of 21 to 27 months, *see* U.S.S.G. § 7B1.4(a); but that range was capped at 24 months by the statutory maximum term of two years, *see* 18 U.S.C. § 3583(e)(3). R. 9-1 at 2. After noting these points, the court revoked Boultinghouse's release and, without explanation as to the penalty it chose, ordered Boultinghouse to serve the maximum permissible term of imprisonment: 24 months. R. 21 at 45.

## II.

Having summarized the revocation proceeding below, we come to the two issues that Boultinghouse pursues on appeal. He contends first that the record does not establish that his waiver of representation by counsel at the revocation hearing was knowing, in the sense that it was fully informed. In his view, the court did not conduct a sufficiently thorough colloquy to advise him of the risks of self-representation, nor did it assess all of the relevant criteria before accepting his decision to proceed pro se. Second, Boultinghouse contends that the court committed a procedural error in failing to state any reasons for the sentence it imposed for the supervised release violations. In the absence of a stated rationale for the sentence, Boultinghouse argues, there is no confirmation that the court considered the statutory sentencing factors, and consequently the record does not permit this court to review the substantive reasonableness of the sentence.

A. Waiver of representation by counsel

The parties have analyzed Boultinghouse's decision to represent himself at the revocation hearing through the lens of the Sixth Amendment, which grants a defendant a right to the

assistance of counsel at all critical stages of the criminal process, *Iowa v. Tovar*, 541 U.S. 77, 80-81, 124 S. Ct. 1379, 1383 (2004), along with a corresponding right to reject counsel and to represent himself, *see Faretta v. California*, 422 U.S. 806, 819-20, 95 S. Ct. 2525, 2533 (1975) (noting that "[t]he right to defend is given directly to the accused[,] for it is he who suffers the consequences if the defense fails"). Sixth Amendment jurisprudence requires that a defendant's waiver of the right to an attorney be knowing and informed as well as voluntary. *Tovar*, 541 U.S. at 88, 124 S. Ct. at 1387; *Faretta*, 422 U.S. at 835, 95 S. Ct. at 2541. Consequently, when a defendant indicates a desire to represent himself, the trial judge is charged with engaging the defendant in a colloquy to establish both that the defendant is waiving his right to counsel of his own free will and with a concrete understanding of the consequences of his decision. *See Tovar*, 541 U.S. at 88-90, 124 S. Ct. at 1387-88; *see also Faretta*, 422 U.S. at 835, 95 S. Ct. at 2541 (citing *Johnson v. Zerbst*, 304 U.S. 458, 464-65, 58 S. Ct. 1019, 1023 (1938)).

However, the Sixth Amendment does not apply in a hearing convened to decide whether a defendant's supervised release should be revoked. *United States v. Kelley*, 446 F.3d 688, 690 (7th Cir. 2006). The Sixth Amendment's protections govern "criminal prosecutions," U.S. Const. amend. VI, but a revocation proceeding, because it focuses on the modification of a sentence already imposed and implicates the conditional (rather than absolute) liberty that the defendant enjoys as a result of that sentence, is not considered to be a stage of a criminal prosecution. *See Gagnon v. Scarpelli*, 411 U.S. 778, 782, 93 S. Ct. 1756, 1759-60 (1973) (revocation of probation); *Morrissey v. Brewer*, 408 U.S. 471, 480, 92 S. Ct. 2593, 2600 (1972)

(revocation of parole); *Kelley*, 446 F.3d at 691 (holdings of *Scarpelli* and *Morrissey* apply to revocation of supervised release) (collecting cases).

Nonetheless, because a revocation proceeding does implicate a defendant's liberty interest, the Fifth Amendment's due process clause accords the defendant certain basic procedural protections in a revocation hearing. *See Scarpelli*, 411 U.S. at 786, 93 S. Ct. at 1761-62; *Morrissey*, 408 U.S. at 487-89, 92 S. Ct. at 2603-04. Among these are a right to representation by counsel not in every instance, but presumptively when the defendant has a colorable claim that he has not committed a violation of the conditions of his release or, alternatively, a substantial case to make against revocation, notwithstanding any violation, that may be difficult to develop or present. *Scarpelli*, 411 U.S. at 790, 93 S. Ct. at 1764; *United States v. Eskridge*, 445 F.3d 930, 932 (7th Cir. 2006).

Federal Rule of Criminal Procedure 32.1, which governs the revocation or modification of supervised release, was largely meant to codify the procedural rights that the Supreme Court referenced in *Morrissey* and *Scarpelli*. *United States v. LeBlanc*, 175 F.3d 511, 515 (7th Cir. 1999); *see also United States v. Mosley*, 759 F.3d 664, 668 n.3 (7th Cir. 2014); *United States v. Kirtley*, 5 F.3d 1110, 1112 (7th Cir. 1993); *United States v. Manuel*, 732 F.3d 283, 291 (3d Cir. 2013); *United States v. Hodges*, 460 F.3d 646, 651 (5th Cir. 2006). The rule requires, among other things, that a defendant facing the potential revocation of his release be advised of his right to retain counsel or to request that counsel be appointed for him if he is unable to obtain representation on his own. *See* Rule 32(b)(2)(D); *Eskridge*, 445 F.3d at

932-33; *Manuel*, 732 F.3d at 291; *Hodges*, 460 F.3d at 651; *see also*18 U.S.C. § 3006A(a)(1)(E) (each district court shall have plan to furnish representation for financially eligible persons charged with violation of supervised release). But because there is no constitutional guarantee of representation in all revocation cases, neither is there a constitutional right to counsel of one's choosing, including a right to self-representation. *See Hodges*, 460 F.3d at 650. Instead, "self-representation in the revocation context is a matter of discretion vested in the district court." *Hodges*, 460 F.3d at 650. Our review of the district court's decision on that score is commensurately deferential. *See United States v. Volpentesta*, 727 F.3d 666, 676 (7th Cir. 2013) ( district court's finding that defendant's waiver of counsel in criminal proceeding was knowing and voluntary reviewed for abuse of discretion) (citing *United States v. Todd*, 424 F.3d 525, 530 n.1 (7th Cir. 2005)).

Although the source of a defendant's right to counsel is different in the revocation context, his waiver of that right, like his waiver of any of the other procedural rights granted by Rule 32.1, still must be both knowing and voluntary. *See generally LeBlanc*, 175 F.3d at 515 (waiver of right to revocation hearing); *Manuel*, 732 F.3d at 291 (waiver of right to counsel); *Hodges*, 460 F.3d at 651-52 (same). Sixth Amendment cases which elaborate on the requirements for a knowing and voluntary waiver of one's right to an attorney thus remain relevant in the revocation context. However, we must have in mind that the due process framework that animates Rule 32.1 is a flexible framework that is focused on the fundamental fairness of the hearing. *See Morrissey*, 408 U.S. at 481, 92 S. Ct. at 2600; *Kelley*, 446 F.3d at 690-91, 692-93; *see also Manuel*, 732

F.3d at 291; *Hodges*, 460 F.3d at 651-52. Rigid compliance with a prescribed colloquy is not required, so long as the totality of the circumstances makes clear that the defendant made a knowing and voluntary choice to proceed without counsel. *See LeBlanc*, 175 F.3d at 517 (waiver of Rule 32.1 rights generally); *Manuel*, 732 F.3d at 291 (waiver of right to counsel); *Hodges*, 460 F.3d at 652 (same). "Although a thorough colloquy with the district court may be the most precise means of evaluating the [knowing and voluntary nature] of the waiver, the failure of the district court to engage in a comprehensive quality is not, of itself, fatal to the defendant's waiver." *Id.* We are looking for the "practical truth" of what the defendant understood was at stake, in the context of a proceeding that is much less formal than a criminal trial. *Id.*; *see also Manuel*, 732 F.3d at 291; *LeBlanc*, 175 F.3d at 517. Thus, where the record confirms that the defendant had a sufficient grasp of a particular right or consequence of the waiver that the court may have omitted from its admonishments, we will sustain the waiver as knowing notwithstanding the gap in the colloquy. *See Hodges*, 460 F.3d at 652*; see also Manuel*, 732 F.3d at 291.

There is no question that Boultinghouse's decision to represent himself was voluntary. This was his decision entirely: he made it against the district court's explicit advice, knowing not only that the district court was prepared to provide counsel to him but that an experienced defense attorney was, in fact, standing by in the courtroom to serve as a resource for him but also to assume responsibility for his defense if that is what he wished. There is no indication or suggestion that anyone pressured him to forego representation by an attorney.

The contested issue is whether his decision to waive the assistance of counsel was knowing in the sense that he appreciated the consequences of his decision. Generally speaking, the waiver is deemed intelligent if the defendant "knows what he is doing and his choice is made with eyes open." *Tovar*, 541 U.S. at 88, 124 S. Ct. at 1387 (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279, 63 S. Ct. 236, 242 (1942)). What circumstances in particular are necessary to confirm that the defendant has made an intelligent choice to represent himself depends on a range of factors that are case-specific, including the extent of his education or sophistication, the complexity of the charge, and the stage of the proceeding at which he elects to proceed pro se. *Tovar*, 541 U.S. at 88, 124 S. Ct. at 1387 (citing *Johnson v. Zerbst*, 304 U.S. at 464, 58 S. Ct. at 1023). Thus, looking at the record as a whole, we consider the following factors: (1) "whether and to what extent the district court conducted a 'formal hearing' into [the defendant's] decision to represent himself, (2) whether there is other evidence in the record that establishes that [the defendant] 'understood the disadvantages of self-representation,' (3) [the defendant's] 'background and experience,' and (4) the 'context' of [the defendant's] decision to proceed pro se." *United States v. Eads*, 729 F.3d 769, 775 (7th Cir. 2013) (quoting *United States v. Avery*, 208 F.3d 597, 601 (7th Cir. 2000)), *cert. denied*, 134 S. Ct. 1579 (2014).

The district court did question Boultinghouse on his decision to proceed without counsel. It engaged Boultinghouse on the subject twice, once at the outset of the revocation hearing, and again at the conclusion of DeCarli's direct examination. On the first occasion, after advising Boulting-

house of his right to representation, the court asked him whether he wanted an attorney, and when Boultinghouse said he did not, the court admonished Boultinghouse both that he would be held to the same standards as an attorney and that he was, in the court's view, pursing an unwise course in forgoing representation. Boultinghouse responded that he understood the maxim that the man who represents himself has a fool for a client; he added that the issues, in his view, were simple. Without formally accepting Boultinghouse's waiver at that time, the court proceeded to recite the charged violations of his supervised release and to ensure that Boultinghouse understood them.

If this were the entirety of the court's inquiry into Boultinghouse's decision to represent himself, it likely would not suffice to establish that his decision was intelligent. It is clear from Boultinghouse's own remark that he appreciated, at least in an abstract sense, the perils of self-representation. But although the court did take pains to ensure that Boultinghouse understood the charges, and had warned Boultinghouse that he would be held to the same standards as a lawyer, it had not, at that point, given him a concrete illustration of why he might be at a disadvantage without counsel, nor had it confirmed that Boultinghouse appreciated what was at stake in the revocation proceeding in terms of his liberty.

But the initial exchange was not the sum total of the court's inquiry into Boultinghouse's decision. The court spoke with him again before he began his cross-examination of DeCarli. During DeCarli's direct examination, the court had alerted Boultinghouse that stand-by counsel was present in the courtroom. When the government concluded its examination

of DeCarli, the court admonished Boultinghouse that an
experienced defense attorney, such as the one it had sum-
moned to the courtroom, would better understand how to
question a witness and would also be familiar with the rules of
evidence. The court also pointed to DeCarli's recommendation
that he be imprisoned for 21 months as an illustration of the
gravity of proceeding. Boultinghouse acknowledged that the
proceeding was "[v]ery serious." R. 21 at 23. Despite these
warnings, and the court's invitation to accept representation by
the counsel it had summoned, Boultinghouse rejected the offer
of an attorney, insisting that he knew his case better than
counsel did. Only at that point did the court accept
Boultinghouse's waiver as knowing and voluntary. Consider-
ing these two exchanges together, and the context in which
Boultinghouse elected to represent himself, we deem the
court's inquiry adequate to ensure his decision was informed.

The fact that the court did not complete its inquiry into the
waiver until the conclusion of DeCarli's direct examination is
not fatal. Certainly it is true, as Boultinghouse has pointed out,
that the government had essentially concluded its case for
revocation by that point; and Boultinghouse had thus been
without representation during the presentation of that case.
But Boultinghouse points to nothing in DeCarli's testimony on
direct examination to which an attorney could have success-
fully objected on the basis of it being inadmissible or improper.
In the main, DeCarli described the procedure he followed in
collecting specimens, reported Boultinghouse's positive test
results and what Boultinghouse said to him when confronted
with those results, and noted Boultinghouse's failure to timely
inform him of his arrest by Posey County authorities. All of

this was relevant and admissible. Moreover, all or nearly all of this was within Boultinghouse's own knowledge, making it easier for him to recognize potential factual inaccuracies or discrepancies in DeCarli's testimony than it otherwise might have been.

The record leaves no doubt that Boultinghouse was aware of some of the ways in which he might be disadvantaged by assuming responsibility for his own defense. Beyond the court's advice that it was unwise to proceed without representation, and its warning that Boultinghouse would be held to the same standards as an attorney, it explained that an attorney would have a better understanding of the rules of evidence and how to question a witness, thus ensuring that Boultinghouse had a specific idea of how counsel would be better equipped than he to represent his position.[4] The court might also have pointed out that an attorney would be better

---

[4] Boultinghouse points out that the federal rules of evidence do not apply in this context. *See* Fed. R. Evid. 1101(d)(3). But that does not mean that anything goes in terms of the evidence that the parties may present at a revocation proceeding; the due process clause and Rule 32.1(b)(2)(C) impose limits which are necessary to a fundamentally fair and just hearing. *See Mosley*, 759 F.3d at 667-69; *Kelley*, 446 F.3d at 692-93. An experienced lawyer will appreciate such limits. Moreover, advising a defendant that a lawyer is familiar with the rules of evidence is a shorthand way of making the broader point that a lawyer knows how to distinguish between admissible and inadmissible evidence, when and how to object to evidence that is (potentially) inadmissible, and how to properly present evidence to the court. Thus, advising Boultinghouse that an attorney is familiar with the rules of evidence was still a meaningful illustration of how a lawyer would be helpful to him in the revocation proceeding, and how his own lack of legal training would put him at a disadvantage.

equipped to recognize potential weaknesses in the government's case and fruitful defense arguments to pursue in opposition to revocation. But having given Boultinghouse two specific examples of things a lawyer was better trained to do than he was, the court did enough to make the benefits of legal counsel more than an abstract proposition.

The record also confirms that Boultinghouse understood what was at stake in the hearing. He indicated that he understood each of the charged violations of his supervised release. Although the court never discussed the full range of possible penalties with Boultinghouse (these of course were set forth in the petition to revoke his supervised release), DeCarli did testify that he was recommending a prison term of 21 months, and the district court reminded Boultinghouse of that recommendation before it accepted his waiver. We have no doubt that Boultinghouse understood that he was facing the possibility of a significant period of incarceration if the court revoked his supervised release. He himself described the stakes as "[v]ery serious." R. 21 at 23.

The nature of the revocation proceeding also informs our judgment. A revocation proceeding is much less formal than a trial. The judge serves as factfinder in this proceeding, *see Johnson v. United States*, 529 U.S. 694, 700, 120 S. Ct. 1795, 1800 (2000), the burden of proof is a simple preponderance of the evidence, *see* 18 U.S.C. § 3583(e)(3), and the rules of evidence do not apply, *see* Fed. R. Evid. 1101(d)(3). The issues in this proceeding were relatively straightforward, as Boultinghouse himself recognized: Had he been using narcotics (and relatedly, had he possessed them and frequented a place where they were sold or distributed), and did he fail to report his

Posey County arrest to his probation officer within 72 hours? Indeed prior to the hearing, Boultinghouse had prepared and submitted an affidavit setting out his position as to these charges.

In this context, we are satisfied that Boultinghouse was capable of making a knowing waiver of his right to counsel and that he did so intelligently. He appreciated what was at stake, understood the nature of the charges, and knew what the factual issues were. He was aware of his right to counsel, had some sense of what a lawyer might be able to do better than he himself could, and was directly advised by the judge not to waive representation. He thus appreciated the risk he was taking by choosing to represent himself.

It is true that the court did not question or expressly discuss Boultinghouse's education, level of sophistication, and experience with the legal system, including self-representation. We are told that Boultinghouse went no further in school than the tenth grade and that he had never before represented himself in a legal proceeding. At the same time, with a criminal history category of VI, Boultinghouse clearly had a significant criminal record, and he had obviously participated in the trial resulting in his conviction in this case. So he had more than a passing familiarity with the criminal process. *See Hodges*, 460 F.3d at 653; *see also Volpentesta*, *supra*, 727 F.3d at 678 ("a defendant's prior experience with the judicial system 'tends to show that he understood the charge against him was serious and that he was accepting a risk by representing himself.'") (quoting *Todd*, *supra*, 424 F.3d at 533). The government suggests that Chief Judge Young necessarily would have had this record in mind when he evaluated the waiver, given that he presided over

Boultinghouse's original trial and sentencing and thus was
familiar with Boultinghouse's background and level of
sophistication. But the trial and sentencing had taken place
years earlier, and because the judge did not comment on
Boultinghouse's background, we agree with Boultinghouse
that we can only speculate about how much of his background
Judge Young may have recalled and taken into consideration,
beyond the fact that Boultinghouse was not new to the criminal
process and had sat through a trial in his courtroom.

The omission of any inquiry into and express evaluation of
Boultinghouse's background, education, and sophistication
certainly renders the inquiry into his waiver less complete than
it ideally ought to have been. But the record otherwise makes
clear that Boultinghouse was fully able to comprehend the
nature of the revocation proceeding, what the issues were, the
risks of proceeding without a lawyer, and how to present his
own case. He had drafted his own affidavit responding to the
probation officer's allegations and supplying the factual
support for his theory of the case. He was able to at least
minimally question DeCarli. He presented to the court a
coherent statement of his position as to the issues and evi-
dence. We have no doubt that a prepared lawyer could have
done a better job as his advocate, as we discuss below. But
whatever the limitations of Boultinghouse's education and
experience, the record does not cause us to doubt his ability to
make an intelligent decision as to his representation.

We also agree that Boultinghouse did not do a particularly
effective job advancing his own interests. For example, when
Boultinghouse commenced his cross-examination of DeCarli by
suggesting that the probation officer was guilty of perjury for

asserting that Boultinghouse had committed another criminal offense, given that the charges for which he had been arrested in Posey County had not yet been resolved, he was overlooking the obvious point that a conviction was not a prerequisite to a finding that he had violated the terms of his supervised release. *See* U.S.S.G. § 7B1.1, comment. (n.1); *United States v. Salinas*, 365 F.3d 582, 587-88 (7th Cir. 2004); *United States v. Fleming*, 9 F.3d 1253, 1254 (7th Cir. 1993) (per curiam). And an attempt to discredit a series of incriminating drug tests by accusing one's probation officer of fraud, perjury, and failure to observe unspecified regulations is not a strategy that is likely to succeed with most judges. A good lawyer would have steered him away from that strategy and looked for more constructive defense theories to pursue.

Among other avenues, Boultinghouse suggests that counsel might have demanded that the individual(s) who performed the urinalyses be produced for examination at the hearing; challenged as vague the condition that Boultinghouse not frequent places where drugs are sold or distributed; attacked as multiplicitous the three separate charged violations based on the positive drug tests; and invoked his Fifth Amendment right against self-incrimination in an effort to exclude from evidence the statements he made to his probation officer. It is not obvious that any or all of these strategies necessarily would have been successful. *See, e.g.*, *Kelley*, 446 F.3d at 691-92 (ban on testimonial hearsay articulated in *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354 (2004), does not apply in revocation hearing); *United States v. Phillips*, 704 F.3d 754, 767-68 (9th Cir. 2012) (rejecting argument that supervised release condition prohibiting defendant from frequenting places where con-

trolled substances were illegally sold, used, distributed, or administered was impermissibly vague or overbroad). But we endorse the point that there surely were more promising defense strategies than the ones Boultinghouse himself opted to pursue. It is likely that an attorney would have pressed the court to pursue a modification of the terms of Boultinghouse's supervised release, as DeCarli himself had first proposed, before convening a revocation hearing and entertaining the possibility of revoking his release and re-incarcerating him. And, if nothing else, counsel surely would have made a case for a lesser prison term upon revocation than that proposed by DeCarli and the government.

But however ill-advised Boultinghouse's strategy may have been, it does not show that his decision to reject representation was unintelligent. A decision may be informed without being right or smart; many human decisions fall into this category. *See Faretta*, 422 U.S. at 834, 95 S. Ct. at 2541 ("[A]lthough [the defendant] may conduct his defense ultimately to his own detriment, his choice must be honored out of 'that respect for the individual which is the lifeblood of the law.'") (quoting *Illinois v. Allen*, 397 U.S. 337, 350-51, 90 S. Ct. 1057, 1064 (1970) (Brennan, J., concurring)); *United States v. Gerritsen*, 571 F.3d 1001, 1009 (9th Cir. 2009) ("In considering whether [the defendant] has effectively waived his right to counsel, we must avoid the tendency of hindsight to diminish the importance of [his] corresponding right to self-representation."). The relevant point here is that before the district court accepted Boultinghouse's waiver, it gave him some concrete under-standing of the ways in which he might be better off with a lawyer. Although the revocation hearing plainly did not turn

out as Boultinghouse hoped, we are satisfied that he knew what he was doing when he insisted on representing himself.

It is always prudent for a court, informed by a defendant that he wishes to waive his right to an attorney, to engage the defendant in a thorough dialogue regarding his decision and to evaluate on the record the factors bearing on the knowing and intelligent nature of the waiver. Yet, as the Supreme Court has said in the Sixth Amendment context, there is no one checklist that a court must follow in evaluating and accepting (or rejecting) a defendant's waiver of his right to counsel. *See Tovar*, 541 U.S. at 88, 124 S. Ct. at 1387. Given the informal nature of a revocation proceeding, the straightforward nature of the factual issues raised in the proceeding here, the fact that the court covered most of the relevant bases before accepting Boultinghouse's waiver, and the fact that the record makes clear that Boultinghouse understood what was at stake in the proceeding and was advised outright by the court that he was making an unwise decision, we believe the court did not abuse its discretion in accepting his waiver.

B. Sentence

Boultinghouse also challenges the 24-month sentence that the court imposed upon revoking his probation. In particular, he contends that because the court did not articulate a rationale for the sentence, the court committed a procedural error that requires us to remand for resentencing.

Our review of a sentence imposed in a revocation proceeding is "highly deferential," and perhaps akin to "'the narrowest judicial review of judgments we know,' namely judicial review of sanctions imposed by prison disciplinary boards." *United*

*States v. Robertson*, 648 F.3d 858, 859 (7th Cir. 2011) (quoting *United States v. Kizeart*, 505 F.3d 672, 675 (7th Cir. 2007)). We will sustain the sentence so long is it is not "plainly unreasonable." *Kizeart*, 505 F.3d at 673-75.

When a district judge revokes a defendant's supervised release and sentences him to a prison term, he must consider both the Guidelines policy statements that prescribe the penalties for supervised release violations, *see* U.S.S.G. Chapter 7, Part B, as well as the statutory sentencing factors set forth in 18 U.S.C. § 3553(a), as applicable to revocations of supervised release, *see* 18 U.S.C. § 3583(e); and he must also "say *something* that enables the appellate court to infer that he considered both sources of guidance." *Robertson*, 648 F.3d at 860 (emphasis in original). "Otherwise, competent appellate review is impossible." *Id.*

There is no dispute here that the district court took into account the Guidelines policy statements. These were cited and applied in the probation officer's petition to revoke Boultinghouse's supervise release, and the court addressed them implicitly in discussing the severity of the violations and the range of possible penalties. R. 21 at 44-45. As we noted earlier, section 7B1.4(a) called for a sentence in the range of 21 to 27 months, but because the sentence was capped by the relevant statute at 24 months, *see* 18 U.S.C. 3583(e)(3), that became the top of the range, *see* § 7B1.4(b)(3)(a). The 24-month sentence imposed by the court was within that (modified) range, and consequently the sentence is entitled to a presumption of reasonableness on appeal. *E.g.*, *United States v. Jones*, 774 F.3d 399, 404 (7th Cir. 2014).

The court did not, however, mention the applicable section 3553(a) sentencing factors; and because the court did not give reasons for the sentence it imposed, we cannot be sure that the court considered these factors. The sentence was within the advisory Guidelines range, and as such it required only a concise explanation by the court. *See United States v. Castaldi*, 547 F.3d 699, 706-07 (7th Cir. 2008). But there is a distinction between a minimal explanation and no explanation at all. As we observed in *United States v. Pitre*, 504 F.3d 657, 664 (7th Cir. 2007) (internal quotation marks and citations omitted), "our inquiry focuses not on the detail with which the district court expressed its reasons for imposing a specified period of confinement, but on whether the district court's statements on the record reflect that it considered the appropriate factors in exercising its discretion."

The same statute which sets forth the factors a sentencing court must consider also requires the court to state its reasons for imposing a particular sentence, *see* 18 U.S.C. § 3553(c); *United States v. Dillard*, 910 F.2d 461, 465 (7th Cir. 1990) (per curiam); and *Robertson* likewise states unequivocally that a sentencing court must articulate some rationale for the sentence imposed on revocation, so as to confirm that it considered both the Guidelines policy statements and the statutory sentencing factors, and to enable us to review the sentence imposed, 648 F.3d at 859-60. The government reminds us that the sentence imposed in *Robertson* was nearly twice the maximum sentence recommended by the Guidelines and as such was a sentence that demanded greater justification by the court. True enough; and the greater the extent of the court's departure from the Guidelines sentencing range, the more

imperative it is for the court to detail its justification for the sentence; a within-Guidelines sentence, by contrast, requires lesser explanation. *See Jones*, 774 F.3d at 404; *compare United States v. Newsome*, 428 F.3d 685, 687-88 (7th Cir. 2005), *with United States v. Dean*, 414 F.3d 725, 730 (7th Cir. 2005). But we have never said that *no* explanation is required. *Robertson* notes that *some* articulation of the court's thinking is necessary to confirm that it has considered the requisite Guidelines policy statements and statutory sentence criteria, and that without a stated rationale appellate review of the sentence is foreclosed. 648 F.3d at 859-60. That is no less true when a court imposes a sentence within the Guidelines range than when it imposes a sentence outside of the range. Nor does the highly deferential standard of review governing a sentence imposed on revocation of a defendant's supervised release eliminate the need for at least a minimal statement of the court's reasons for the sentence. *See Jones*, 774 F.3d at 404 ("The explanation must be sufficient to allow a court of appeals to assess the reasonableness of the sentence imposed.") (citing *United States v. Conaway*, 713 F.3d 897, 903 (7th Cir. 2013)). In the absence of any rationale, we cannot meaningfully review the sentence imposed.

It is not our intent to elevate technical form over substance, particularly with respect to a proceeding that is informal and the result of which commands great deference from us as a reviewing court. We are also mindful that district judges have crowded dockets imposing many demands on their time. Our insistence that reasons be given for a sentence imposed upon the revocation of release is not an onerous requirement. When the sentence imposed is within the range recommended by the Guidelines policy statements, a court need only say enough to

assure us that it has considered both the policy statements and the section 3553(a) factors and to explain why it has selected a particular sentence within the recommended range.

The range in this case was a narrow one as a result of the statutory cap. One might be tempted to say that no explanation is needed to justify a sentence of 24 months versus 21 months. But this strikes us as a perilous path to go down. Even small differences in the sentence matter to the defendant, and we do not think that the district court's obligation to explain its sentencing decision may be excused simply because the stakes may seem less significant to us. *See Glover v. United States*, 531 U.S. 198, 121 S. Ct. 696 (2001) (unchallenged Guidelines error resulting in relatively modest increase in defendant's sentence may be sufficient to establish prejudice for purposes of an ineffective assistance of counsel claim), *abrogating Durrive v. United States*, 4 F.3d 548, 550-51 (7th Cir. 1993); *Martin v. United States*, 109 F.3d 1177, 1178 (7th Cir. 1996). That point aside, it is important to remember that the reasons a judge gives for his sentence help to explain not only why he has chosen a particular sentence within the Guidelines range, but also why he opted to accept the recommended range in the first instance, as the judge not only was not bound by the range, *see*, *e.g.*, *United States v. Neal*, 512 F.3d 427, 438 (7th Cir. 2008) (sentencing ranges recommended by Guidelines policy statements "inform[ ] rather than cabin[ ] the district court's sentencing discretion") (quoting *Pitre*, 504 F.3d at 664), but could not presume, as we may on appeal, that a within-Guidelines sentence is presumptively reasonable, *see Nelson v. United States*, 555 U.S. 350, 352, 129 S. Ct. 890, 892 (2009) (per curiam). Again, the need to justify the sentence is modest when

the sentence is within the Guidelines range, but absent any explanation, we cannot do our job as an appellate court: we would be placed in the position of offering our own justifications for the sentence rather than reviewing the district court's reasons. *See United States v. White*, 888 F.2d 490, 495 (7th Cir. 1989) ("The dominant role of the sentencing judge's findings and reasons means that we need ready access to them."), *abrogated on other grounds by Stinson v. United States*, 508 U.S. 36, 113 S. Ct. 1913 (1993). We have no option but to remand for resentencing.

Remand will have the salutary effect of enabling the parties as well as the court to make a more complete record as to the appropriate penalty in this case. Although both parties nominally had the opportunity to address the subject of sentencing in their remarks at the close of evidence as to whether Boultinghouse had violated the conditions of his release (at which time the government summarily urged the court to impose the maximum sentence), the court never specifically advised Boultinghouse that he could address the court on that subject, or that he had the right to present mitigating information. *See* Rule 32.1(b)(2)(E); *Pitre,* 504 F.3d at 662 ("Rule 32.1 requires a district court to ask the defendant if she wishes to make a statement for the court to consider before imposing a term of reimprisonment following revocation of supervised release."); *but see also United States v. Robertson*, 537 F.3d 859, 862 (8th Cir. 2008) (acknowledging that Rule 32.1 entitles defendant to make a statement and present mitigating information to court, but questioning whether rule imposes obligation on court to advise him of this right and invite him to make statement).

### III.

The district court did not abuse its discretion in deeming Boultinghouse's waiver of his right to counsel at the revocation proceeding to be knowing and intelligent. The absence of a stated rationale for the 24-month sentence that the court imposed upon revoking Boultinghouse's supervised release amounted to procedural error which requires resentencing. The decision to revoke Boultinghouse's supervised release is therefore affirmed; the sentence is vacated and the matter is remanded for resentencing.