In the

# United States Court of Appeals

## For the Seventh Circuit

No. 14-3452

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

BRIAN FORD,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 00-CR-227 — **Charles N. Clevert, Jr.**, *Judge.*

ARGUED JUNE 1, 2015 — DECIDED AUGUST 20, 2015

Before WOOD, *Chief Judge*, and POSNER and WILLIAMS, *Circuit Judges*.

WOOD, *Chief Judge*. Brian Ford keeps getting into trouble. After pleading guilty to a drug offense in 2001, he was sentenced to a term of imprisonment followed by supervised release. While on supervised release, he committed an act of prostitution and other violations of the conditions of release, and he was sentenced to new terms of imprisonment and supervised release. Ford then allegedly committed a sub-

stantial battery while serving his second term of supervised release. After holding a revocation hearing, the district court found that Ford had indeed committed the battery and thus had again violated the conditions of his supervised release. Ford now appeals, claiming that the district court made a number of errors in connection with the revocation. Because Ford has waived some arguments and the rest have no merit, we affirm the district court's judgment.

**I**

In 2001, Ford pleaded guilty to one count of conspiracy to possess with intent to distribute more than 50 grams of crack cocaine and more than five kilograms of powder cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846. After a series of sentencing reductions, he ultimately was sentenced to 97 months of imprisonment, followed by five years of supervised release. In 2009 he was released from prison and began his term of supervised release. In 2013, the district court revoked Ford's supervised release after finding that he had committed multiple violations of his supervised release conditions. The court sentenced him to a 12-month term of imprisonment and an 18-month term of supervised release. Ford was released from prison on May 30, 2014, and began his second term of supervised release.

On August 4, 2014, Ford allegedly committed a substantial battery. The district court held a revocation hearing on September 10, 2014, to determine whether the allegation was true. Such an act, if proven, would constitute a violation of the condition requiring Ford not to commit another federal, state, or local crime. Three witnesses testified at the hearing: Scott Rahoi, the alleged victim of the battery, Milwaukee Po-

lice Officer Lafayette Emmons, and Milwaukee Police Detective Andre Matthews.

The government first called Rahoi, who testified that a person he knew as "Tony" was an apartment manager at the building in which Rahoi lived. He identified Ford in court as Tony. Rahoi stated that on August 4, 2014, Ford barged into his apartment and angrily instructed him to vacate the residence. After Rahoi told Ford that he needed time to pack his belongings, Ford became more irate and began to punch and kick Rahoi, until Rahoi almost lost consciousness. Once Ford left the apartment, Rahoi called 911. Officer Emmons arrived soon thereafter, and Rahoi told him what had happened. Later, while Rahoi was at the hospital, Officer Emmons showed Rahoi a photo array, and Rahoi identified a picture of the man he knew as Tony.

Rahoi admitted that he previously had committed a felony and that he had problems with alcohol, though he later denied that he had been drinking at the time of the incident. On cross-examination, he further admitted that he had probably seen Ford only twice before August 4, 2014. He confessed that he had gotten into a fight with Jasmine Smith, another tenant in his apartment, a few days before Ford attacked him. During the cross-examination, Ford's counsel referred to a Milwaukee police report labeled Exhibit 5, in which Smith had stated that Rahoi smoked crack cocaine on the day of the incident. Rahoi denied this allegation.

Officer Emmons testified next. He stated that Rahoi had told him that Tony, the building's property manager, had attacked him. Elaborating, he said that Rahoi had given him both a description of Tony and Tony's phone number, which Rahoi had obtained from another tenant. Emmons identified

Exhibit 3 as the photo array he had given to Rahoi while Rahoi was in the hospital. Emmons indicated that Rahoi had identified Ford's picture as that of his assailant. There was some confusion, however, about the order of the photographs on the original array as compared to the order displayed in Exhibit 3. For this reason, it is unclear whether Rahoi actually identified Ford or a man named Joseph Diaz.

Finally, Detective Matthews testified that he interviewed Ford a few weeks after the incident. Matthews stated that Ford had told him that he was not a property manager for Rahoi's building and that he did not know Rahoi. After being shown Exhibit 5 (the police report), Matthews testified that Smith had told him that either Brandon or Tony managed the building. He also said that Smith had identified a photo of Ford as Tony. Ford's counsel did not object to the use of Exhibit 5. On cross-examination, counsel briefly questioned Matthews about Smith's identification of Ford and Smith's statements regarding Rahoi's crack cocaine use.

The government then rested. The court asked if the government wanted to enter the police report into evidence, and it responded affirmatively. Before admitting the document into evidence, the court asked Ford's counsel if he had any objection, to which he responded, "No, sir." The revocation hearing resumed on October 28, 2014. Ford was the only witness. Ford denied involvement in the August 4, 2014 **attack and testified that he had never seen Rahoi before** the revocation hearing. He swore that he had been at home on the day of the incident and further noted that he had been in the property management business before but had stopped working in that area over a year ago. During this testimony, Ford's counsel attempted to introduce Smith's statements

about Rahoi's drug use, but the court sustained the government's objection on relevance grounds.

The district court concluded that the government had shown by a preponderance of the evidence that Ford had violated his supervised release conditions by committing a substantial battery against Rahoi. In coming to this decision, the court relied on each of the testifying witnesses as well as Smith's statements from the police report. The court sentenced Ford to 36 months of imprisonment with no supervised release, plus restitution in the amount of $646.84. The court noted that it considered "all of the factors" under § 3553(a)(2). In particular, it discussed the seriousness of Rahoi's injuries; it stated that "the community should be protected from [Ford's] outbursts"; and it concluded that "supervision to date has not been effective." Finally, the court determined that the sentence was "consistent with the applicable guideline range of from [*sic*] 30 to 37 months."

Ford timely appealed the district court's judgment and sentence. He raises three arguments. First, he contends that the court violated Federal Rule of Criminal Procedure 32.1(b)(2)(C) and the Due Process Clause of the Fifth Amendment by allowing the government to introduce Smith's statements, as contained in the police report. Second, he argues that 18 U.S.C. § 3583(e)(3) and (h) dictate that his statutory maximum sentence is one year and that his 36-month sentence thus exceeds this maximum. Finally, Ford alleges that the district court committed procedural error by not adequately examining the relevant factors listed in 18 U.S.C. § 3553(a) at sentencing.

## II

We begin with Ford's contention that the district court erred in admitting Smith's statements from the police report, Exhibit 5. Ford did not make this objection in the district court. In fact, Ford's counsel was the first to refer to Smith's statements, during his cross-examination of Rahoi. He again mentioned Smith's comments while cross-examining Detective Matthews, albeit after the government had elicited testimony from Matthews about his interview with Smith. Counsel also attempted to introduce the statements during Ford's testimony. The district court explicitly asked Ford's counsel whether he objected to the admission of the police report that included Smith's statements into evidence, and counsel replied that he did not.

Waiver occurs where there is an "intentional relinquishment or abandonment of a known right." *United States v. Olano*, 507 U.S. 725, 733 (1993) (citing *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). In contrast to forfeiture, where "a defendant negligently bypasses a valid argument," "waiver requires a calculated choice to stay silent on a particular matter." *United States v. Anderson*, 604 F.3d 997, 1001 (7th Cir. 2010). Ford's counsel's actions at the revocation hearing demonstrated a calculated choice to remain silent during the government's use of the police report, so that counsel could also use the report—particularly Smith's statements regarding Rahoi's drug use—to impeach Rahoi. Counsel repeatedly brought up these statements, and he—not the government— made the first reference to the report. Moreover, the court clearly brought the admissibility of the report to counsel's attention, and counsel declined to object. These actions indicate that counsel (on behalf of Ford) intentionally relin-

quished the right to object to the admissibility of the report and the statements contained within it.

Ford now argues that because the Federal Rules of Evidence do not apply to supervised release proceedings (and because Ford consequently had no right under those Rules to prevent the admission of the statements), he could not have waived his right to object on appeal. But even if Ford had no rights under the Federal Rules of Evidence, he still could have complained by invoking either Federal Rule of Criminal Procedure 32.1(b)(2)(C) or the Due Process Clause, both of which protect defendants in revocation hearings. Ford's counsel did neither, even when prompted by the court. Instead, he affirmatively used portions of the very report to which he now objects. This was more than enough to demonstrate waiver.

Even if we are wrong and Ford merely forfeited, rather than waived, the objection, we would still not reverse. Because Ford did not object in the district court, our review would be limited to a search for plain error. See FED. R. CRIM. P. 52(b); *Puckett v. United States*, 556 U.S. 129, 135 (2009). Plain error requires: "(1) an error or defect (2) that is clear or obvious (3) affecting the defendant's substantial rights (4) and seriously impugning the fairness, integrity, or public reputation of judicial proceedings." *Anderson*, 604 F.3d at 1002. An error affects the defendant's substantial rights if it "affected the outcome of the district court proceedings." *United States v. Wheeler*, 540 F.3d 683, 689 (7th Cir. 2008).

Any error in admitting the statements did not affect the outcome of these proceedings. In a revocation hearing, the district court must find that the defendant violated a condition of his supervised release by a preponderance of the evi-

dence. See 18 U.S.C. § 3583(e)(3); *United States v. Goad*, 44 F.3d 580, 585 (7th Cir. 1995). Here, the alleged victim identified Ford in court as his assailant and stated that he had seen Ford, whom he knew as Tony, twice before the battery. Another building tenant gave Rahoi a phone number for the apartment manager, which Rahoi then gave to Officer Emmons. This number led to Ford (thus corroborating Rahoi's account of Ford as the apartment manager who went by the name of Tony). Finally, Officer Emmons testified as to Rahoi's extensive injuries. The only contradictory evidence was Ford's own account of the events—an account the district court was entitled to reject as not credible. Thus, there was no reversible error in the use of the police report; with or without it, there was ample evidence to show that Ford had committed a substantial battery against Rahoi.

## III

Ford next argues that his sentence exceeds the statutory maximum. We review statutory interpretation questions *de novo*. See *United States v. Thornton*, 539 F.3d 741, 745 (7th Cir. 2008). Title 18 U.S.C. § 3583 limits the length of the prison term a court may impose after it revokes a defendant's supervised release. In general, a court may impose a sentence equal to the length of the supervised release authorized by statute for the offense that "resulted in" the supervised release that is currently being revoked. See 18 U.S.C. § 3583(e)(3). There are, however, some limitations on the court's choice of sentence. For example, a prison sentence following a revocation of a supervised release term that was imposed for a class A felony cannot exceed five years, while a prison sentence after revocation of supervised release im-

posed in connection with a class B felony cannot exceed three years. Section 3583(e)(3) reads in full:

> The court may … revoke a term of supervised release, and require the defendant to serve in prison all or part of the term of supervised release authorized by statute for the offense that resulted in such term of supervised release without credit for time previously served on postrelease supervision, if the court, pursuant to the Federal Rules of Criminal Procedure applicable to revocation of probation or supervised release, finds by a preponderance of the evidence that the defendant violated a condition of supervised release, except that a defendant whose term is revoked under this paragraph may not be required to serve on any such revocation more than 5 years in prison if the offense that resulted in the term of supervised release is a class A felony, more than 3 years in prison if such offense is a class B felony, more than 2 years in prison if such offense is a class C or D felony, or more than one year in any other case.

18 U.S.C. § 3583(e)(3).

Ford's argument centers on the phrase "the offense that resulted in the term of supervised release." He contends that "offense" in this context refers to whatever action immediately caused the defendant's most recent term of supervised release, and thus does not always signify the offense for which supervised release was initially imposed. Consider an example: A defendant commits a class A felony and is sen-

tenced to imprisonment followed by supervised release. After release from prison, but during her term of supervised release, the defendant commits a class B felony, which constitutes a violation of the supervised release. The "offense that resulted in" the supervised release was the class A felony; thus, the maximum term of imprisonment that the court can impose upon revocation is five years, under 18 U.S.C. § 3583(e)(3). The court imposes a prison sentence and a new term of supervised release. While on the second term of supervised release, the defendant commits a class C felony, another violation of her supervised release conditions. The court again must look to "the offense that resulted in the term of supervised release" to determine the statutory maximum sentence upon revocation. Ford argues that this offense is the class B felony, rather than the class A felony, because the class B felony is what directly "resulted in" the defendant's second supervised release term. Thus, in this case, Ford contends that the court should look to his 2013 violation of supervised release conditions, rather than his original 2001 conviction, in order to determine the maximum prison term under § 3583(e)(3).

For support, Ford contrasts § 3583(e)(3) with § 3583(h). The latter provision, which limits the length of new terms of supervised release that a court can impose after it revokes a term of supervised release, uses the phrase "offense that resulted in the *original* term of supervised release." 18 U.S.C. § 3583(h) (emphasis added) ("The length of such a term of supervised release shall not exceed the term of supervised release authorized by statute for the offense that resulted in the original term of supervised release."). Because § 3583(e)(3)—unlike § 3583(h)—omits the word "original," Ford argues, it must be referring to the defendant's most re-

cent offense, *i.e.*, the one that most immediately caused the defendant's current term of supervised release.

While we give Ford full marks for creativity, his reading of § 3583(e)(3) makes hash of the larger statutory scheme. The provision refers to "offense[s]," but violations of supervised release need not be criminal in nature: a defendant can violate the terms of his supervised release without committing a statutorily defined crime. See, *e.g.*, *United States v. Marvin*, 135 F.3d 1129, 1131–32 (7th Cir. 1998) (discussing violation of special condition not to obtain loans or open new bank accounts). Thus, § 3583(e)(3)'s reference to "offense" must signify the offense for which the defendant was initially placed on supervised release.

Ford counters that the term "offense" encompasses non-criminal violations of supervised release. Congress, he says, would have used the word "conviction" if it had wanted to refer to the original crime. But he points to no statute or case using the term "offense" in such a broad way. To the contrary, federal criminal statutes treat the word as referring to expressly criminal activity. See, *e.g.*, 18 U.S.C. § 16 (defining "crime of violence" to mean an "offense" with certain characteristics"); *id.* § 921(a)(33)(A) (same for "misdemeanor crime of domestic violence"). The titles of various provisions of the criminal code confirm this interpretation. See, *e.g.*, *id.* § 19 (section titled "Petty offense defined"); *id.* § 24 (section titled "Definitions relating to Federal health care offense"); *id.* § 1341 *et seq.* (chapter titled "Mail Fraud and Other Fraud Offenses"); *id.* § 3271 *et seq.* (chapter titled "Extraterritorial Jurisdiction over Certain Trafficking in Persons Offenses").

Moreover, the classification system to which § 3583(e)(3) refers would make little sense if "the offense that resulted in

the term of supervised release" could be a non-criminal violation of supervised release. Section 3583(e)(3) sets the maximum terms of imprisonment based on the letter grade of this "offense." If an offense is not classified by a letter grade in the provision that defines it, it is classified at 18 U.S.C. § 3559 according to its maximum term of imprisonment. See 18 U.S.C. § 3559(a) (defining offenses with maximum term of life imprisonment as class A felonies, offenses with maximum term of 25 years or more as class B felonies, and so on). Under Ford's interpretation, it is unclear how to classify a non-criminal violation of a supervised release condition; the condition itself neither contains a letter grade classification nor sets out a maximum term of imprisonment for its violation. In addition, § 3559 applies only to sentences for "a defendant who has been found guilty of an offense described in any Federal statute." 18 U.S.C. § 3551(a). Even if we were to credit Ford's interpretation of offense as encompassing violations of supervised release (which we do not), a defendant is not "found guilty" of such a violation. Rather, the court must find by a preponderance of the evidence that the defendant committed the violation. Ford's last-ditch attempt is to point to § 3583(h), the provision allowing courts to reimpose terms of supervised release upon revocation, as a stand-in for the substantive offense. But this provision merely authorizes a court to impose subsequent punishment; it does not define an offense, and it does not set a statutory maximum term of imprisonment.

In all, Ford's interpretation does nothing but create confusion and ambiguity in a statutory scheme that, under the normal reading of the language, works reasonably well. The phrase "the offense that resulted in the term of supervised release" refers to the offense for which the defendant was

initially placed on supervised release. For Ford, this is his 2001 conviction for conspiracy to possess with intent to distribute crack and powder cocaine. That offense carries a statutory maximum sentence of life imprisonment, see 21 U.S.C. § 841(b)(1)(A), and is thus a class A felony. See 18 U.S.C. § 3559(a)(1). The maximum allowable prison term upon revocation in connection with such an offense is five years. See *id.* § 3583(e)(3). Since April 2003, when the PROTECT Act took effect, see Pub. L. No. 108-21, 117 Stat. 650 (2003), the maximum term of imprisonment starts anew with each revocation of supervised release. See U.S. SENTENCING COMM'N, FEDERAL OFFENDERS SENTENCED TO SUPERVISED RELEASE 42–43 (July 2010). Ford's new sentence upon his second revocation could thus have been as much as 60 months, well above the 36 months he received.

## IV

Ford's final claim is that the district court committed procedural error by not adequately considering the relevant sentencing factors. Our review of a sentence for supervised release violations is "highly deferential." *United States v. Jones*, 774 F.3d 399, 403 (7th Cir. 2014). Nevertheless, the district court is required to consider the U.S. Sentencing Guidelines policy statements and relevant sentencing factors. The court must "say *something* that enables the appellate court to infer that he considered both sources of guidance," *United States v. Robertson*, 648 F.3d 858, 859–60 (7th Cir. 2011), though it "need not consider the § 3553 factors in check-list form." *Jones*, 774 F.3d at 404. When revoking a term of supervised release, 18 U.S.C. § 3583(e) requires the court to consider several—but not all—of the factors set forth in 18 U.S.C. § 3553(a): (a)(1) (the nature and circumstances of the

offense and the history and characteristics of the defendant), (a)(2)(B)–(D) (the need for the sentence to deter criminal conduct, protect the public from further crimes, and provide the defendant with training and treatment), (a)(4) (the guidelines range), (a)(5) (the guidelines policy statements), (a)(6) (the need to avoid unwarranted sentencing disparities), and (a)(7) (the need to provide restitution to victims).

The district court's consideration of these points was satisfactory. The judge noted that he had taken into account "all of the factors" under § 3553(a)(2) and singled out the need to protect the community from Ford's "outbursts." He invoked deterrence when he observed that supervision had not been effective for Ford and that the Probation Office would be put to better use by "working with someone who is more susceptible to behavior modification." These statements, along with the discussion of Rahoi's injuries, show that the judge considered the nature of the crime and Ford's history and characteristics. The judge looked to the guidelines range and policy statements when he discussed the appropriate sentencing range, and he addressed the need to impose restitution. While he did not specifically mention the need to provide Ford training and treatment or the goal of avoiding sentencing disparities, he was not required to run through each factor one by one. Overall, he said enough.

Ford also contends that the court impermissibly considered factor (a)(2)(A) when it discussed the extent of Rahoi's injuries. This factor, which is not listed in § 3583(e), describes the need "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). It is not clear that the court was relying specifically on (a)(2)(A) in its statements; it

never specifically mentioned that factor, and, as noted above, the discussion of Rahoi's injuries easily fits within factor (a)(1). But even if it did rely to some extent on the seriousness of Ford's offense, any such reliance was not error under this circuit's law. See *United States v. Clay*, 752 F.3d 1106, 1108 (7th Cir. 2014) (siding with the majority of circuits to find that court may address factor (a)(2)(A) when revoking supervised release "so long as the district court relies primarily on the factors listed in § 3583(e)"). The court placed little weight on factor (a)(2)(A); instead, it relied on other factors that are included in § 3583(e), such as the guidelines range, deterrence, protection of the community, and the need for restitution. Thus, the court's references to Rahoi's injuries did not taint the validity of Ford's sentence.

## V

Ford has waived his objection to the admission of Smith's statements, and, even if he merely forfeited it, he cannot show plain error. The statutory maximum prison sentence upon revocation of supervised release was properly based on the initial offense; thus, Ford's 36-month sentence was permissible. Finally, the district court did not commit procedural error in sentencing Ford. We therefore AFFIRM both the district court's order finding that Ford violated the conditions of his supervised release and the court's sentence of 36 months in prison.