In the

# United States Court of Appeals

## For the Seventh Circuit

No. 20-1233

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DEVIN DAWSON,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:16-cr-00805 — **Ronald A. Guzmán**, *Judge.*

ARGUED SEPTEMBER 23, 2020 — DECIDED NOVEMBER 19, 2020

Before HAMILTON, SCUDDER, and ST. EVE, *Circuit Judges.*

ST. EVE, *Circuit Judge.* Devin Dawson violated the conditions of his supervised release after his release from prison. One of Dawson's violations was possessing a loaded, semiautomatic firearm. That violation separately resulted in state criminal charges. The state charges were still pending when the federal district court in this case revoked Dawson's supervised release and imposed a new 24-month prison term. On appeal, Dawson says the district court chose its 24-month

sentence—the statutory maximum—to punish him for possessing the firearm, when it should have focused on his breach of the court's trust and left any punishment to the state-court system. He also submits that the court disregarded his mitigation arguments and the relevant sentencing factors, and that the sentence was plainly unreasonable. We see no error and affirm.

## I. Background

Dawson received his original prison sentence after he pled guilty in the Northern District of Iowa to conspiring to transport stolen property in interstate commerce, in violation of 18 U.S.C. §§ 371 and 2314. This charge arose from Dawson's role in a shoplifting scheme that targeted hardware and home-improvement stores throughout the Midwest. For his role in the scheme, Dawson received 18 months of prison followed by three years of supervised release. The sentencing judge ordered Dawson to pay $12,451.52 in restitution to the stores victimized by the shoplifting spree. Dawson got out of prison and began supervised release in July 2018. In November 2018, the Northern District of Illinois assumed jurisdiction over Dawson's supervised release.

### A. Supervised Release Violations

Less than a year after his release from prison, Dawson's probation officer asked the district court to revoke Dawson's supervised release because Dawson had violated several of its conditions. The most serious violation was possession of a firearm. Police officers had stopped Dawson and his brother for traffic violations. After making the stop, but before exiting the squad car, the officers saw Dawson—who was sitting in the front passenger seat—bend forward out of sight and then

reappear. When the officers searched the car, they found a loaded 9mm semi-automatic blue steel Glock Model 19 with a 30-round magazine under Dawson's seat. The officers arrested Dawson and he was charged in state court with unlawful use of a weapon and aggravated unlawful use of a weapon. He was later released to home confinement on electronic monitoring. As for the other violations: one was using controlled substances and failing to submit to periodic drug testing. Another was failing to tell probation that he had received a ticket for running a stop sign and driving without a license. And the last was failing to make restitution payments.

A few months later, probation notified the court of a fifth violation, again stemming from a traffic stop. This time, Dawson had failed to produce a license or proof of insurance and had given the investigating officer his brother's name and date of birth. The lie did not hold up; Dawson soon confessed his real name and the officer learned that he was driving on a suspended license. The officer searched the car and found an electronic-monitoring device for home confinement in the trunk. The device had been altered to include a battery-based power supply. After Dawson admitted that he was on home confinement, the officer arrested him. Dawson faced additional state criminal charges for this conduct.

## B. Preliminary Revocation Hearing

The district court held two hearings on the revocation of Dawson's supervised release. The first took place on December 4, 2019. At this hearing, the government told the court that the parties had agreed that the government would rely on police reports alone to prove the firearm violation. Dawson, however, insisted that the parties had reached no such agreement. After noting the apparent misunderstanding between

the parties, the court addressed the government as to how it wished to proceed on the firearm violation:

> [W]hat the government has to do … is to decide: Is a violation of a person on supervised release to the Federal Court, based upon the allegation that he was in possession of a loaded 9 millimeter semiautomatic Glock firearm while he was on supervision sufficiently serious for the government to want to proceed on a violation?
>
> Because I will tell you what happens in State Court, is they have 500 of these a day and they do literally nothing. In fact, the last time I had this very same issue before me, the defendant chose to admit the violation, I entered a disposition which included more jail time, and on that basis the State Court dismissed the actual allegations of the State criminal proceeding.
>
> So if there is going to be any real sanction for this, in my opinion it will be here, not in the overburdened, overloaded State Courts that have insufficient resources or manpower.

Given that Dawson did not agree to proceeding by way of proffer, the court gave the government more time to consider whether to call witnesses to prove the firearm violation.

### C. Final Revocation Hearing

The court held the second and final revocation hearing on January 29, 2020. To prove the firearm violation, the government called one of the officers who stopped Dawson and his brother to testify about finding the firearm under Dawson's seat. For his part, Dawson called another officer who was involved in the stop to testify about his version of the events.

Relying on a supposed contradiction between the officers' testimony, Dawson argued that the government had not proved that he, rather than his brother, possessed the firearm. The court found by a preponderance of the evidence that Dawson had possessed the firearm and thereby violated his supervised release conditions. Dawson did not contest the other four violations, though he offered context for two of them. On the controlled substances violation, Dawson argued that his missed drug tests were not evidence of drug use because some preceded his release from custody and the rest were surrounded by negative tests. On the restitution violation, Dawson submitted a sworn statement explaining his limited ability to pay. The court found that the government had proved each of the violations.

The court moved next to the appropriate sentence for the violations. The advisory Guidelines range was 6 to 12 months in prison. The statutory maximum was 24 months. Dawson's counsel requested nine months. He stressed the positive aspects of Dawson's life, including that Dawson was working long hours and taking care of his niece after his brother's passing, and that he was expecting a child with his girlfriend. Dawson's counsel reminded the court that the point of a revocation sentence is to sanction a defendant's breach of trust—not to punish the defendant for the violative conduct. The government and probation recommended 12 months. The government agreed that the court should sanction Dawson's breach of trust and argued that Dawson's violations—in particular, his firearm and electronic-monitoring violations—displayed a complete disregard for court orders and the conditions of supervised release. Before imposing its sentence, the court asked Dawson's counsel a follow-up question: "As a breach of trust, do you interpret that

to mean that I should not take into account what the defendant actually did? That, for example, missing a urine drop should have the same effect as shooting someone in terms of the violation?" Defense counsel responded, "No, Judge. I'm not saying that."

The court revoked Dawson's supervised release and sentenced him to 24 months' imprisonment with no supervised release to follow. In explaining the sentence, the court focused first on the electronic-monitoring violation:

> I find that the defendant has definitely shown a lack of respect for the conditions of supervised release. He has violated them in various ways and shows a clear lack of respect for court orders in general when he violates an electronic monitoring order, is found driving around [in] the middle of the night with a hijacked electronic surveillance gadget attached to a battery.

The court turned next to Dawson's failure to make restitution payments despite his ability to pay at least some amount. "The Court is mindful that it's not easy, that it is a hardship to have to use some of your hard-earned money to pay the restitution, but it was part of the Court's order and should have been respected. It was not." As for Dawson's missed drug tests, the court considered them a "technical violation" given Dawson's explanation for them, which probation had agreed with.

The main problem, in the court's view, was the firearm violation. It explained why it considered this violation particularly "egregious":

> In a city where innocent people are shot every day, where you turn on the news or pick up the newspaper

and you find another horrible weekend where so many dead and so many injured, for this defendant to be in possession of a killing machine like a 9mm semiautomatic Glock with an extended cartridge is beyond the realm. It's just beyond anything that I can understand. And to do so while he's on the Court's supervision is not only an affront to the Court, but it's a danger to the community. It shows that he lacks any real interest in rehabilitation. I just find that that is too dangerous of conduct for the Court to do anything but impose a significant custodial sentence, and I find that the guidelines in this case do not accurately reflect the seriousness of this offense.

I'm going to enter a sentence above the guidelines for that reason. I stated on prior occasions why I feel the guidelines with respect to this particular geographic location, Chicago, and the wave of gun violence that we are experiencing for several years now, why the guidelines simply do not contemplate how serious such an offense is in this particular geographic location at this particular point in time.

The court made its sentence consecutive to any forthcoming sentence in the pending state-court case against Dawson. Dawson's counsel urged the court to reconsider and make the sentence concurrent. The court rejected that request, commenting, "I just can't envision—short of actually shooting someone, I can't envision what your client is doing driving around in a car with a loaded 9mm semiautomatic gun with an extended clip except to do something really violent." "He had no business doing that, none."

Dawson appeals his 24-month sentence.

## II. Discussion

Dawson's primary contention on appeal is that the district court improperly sentenced him as punishment for the firearm violation when it should have focused on his breach of the court's trust. He also maintains that the district court ignored his mitigation arguments, failed to adequately consider the applicable § 3553(a) sentencing factors, and instead weighed an impermissible factor: whether Dawson was going to receive a sentence on the state-court firearm charge. Finally, even putting these procedural errors to the side, Dawson says the district court's 24-month sentence was plainly unreasonable because it doubled the recommendations of probation and the government, which were already at the high end of the advisory Guidelines range.

### A. Breach of Trust

We review claims of procedural error de novo. *United States v. Karst*, 948 F.3d 856, 864 (7th Cir. 2020).

A district court may—and sometimes must—revoke a defendant's supervised release and impose a fresh term of imprisonment if it finds by a preponderance of the evidence that the defendant has violated the conditions of supervised release. 18 U.S.C. § 3583(e)(3), (g). Here, Dawson's firearm violation mandated revocation of his supervised release, *see* § 3583(g), but the court had discretion over what sentence to impose, *see* § 3583(e)(3). The United States Sentencing Commission has issued policy statements that recommend sentencing ranges for supervised release violations. United States Sentencing Commission, Guidelines Manual ch. 7 (Nov. 2018). These policy statements "are non-binding and meant to inform rather than cabin the exercise of the judge's

discretion." *United States v. Raney*, 842 F.3d 1041, 1044 (7th Cir. 2016) (internal quotation marks and citation omitted). In this case, the recommended range was 6 to 12 months' imprisonment. Revocation sentences are also subject to statutory caps. These statutory caps depend on the seriousness of the original crime of conviction—not the seriousness of the supervised release violation. *See id.*; *United States v. McClanahan*, 136 F.3d 1146, 1150 (7th Cir. 1998). The statutory cap in this case was 24 months. 18 U.S.C. § 3583(e)(3).

These statutory caps reflect the unique purpose of revocation sentences. The point is not to punish a defendant's violation as if it were a new federal crime, but rather to sanction the defendant's breach of the court's trust—that is, his or her failure to comply with court-ordered conditions arising from the original conviction. *United States v. Haymond*, 139 S. Ct. 2369, 2386 (2019) (Breyer, J., concurring); *see United States v. Huusko*, 275 F.3d 600, 603 (7th Cir. 2001). The Sentencing Commission's policy statements on revocation sentences endorse this "breach of trust" theory of punishment. The Sentencing Commission instructs courts to "sanction primarily the defendant's breach of trust, while taking into account, to a limited degree, the seriousness of the underlying violation and the criminal history of the violator." United States Sentencing Commission, Guidelines Manual ch. 7, pt. A, intro. 3(b) (Nov. 2018).

This is not to say, however, that a district court must ignore the character of a defendant's violations when fashioning a revocation sentence. To the contrary, a more serious violation likely reflects a more serious breach of trust. We made this point in *McClanahan*. Like Dawson, McClanahan argued that the district court had impermissibly

configured his 24-month sentence as punishment for his supervised release violations. *McClanahan*, 136 F.3d at 1148–49. We found his argument "baseless" because the record showed that the court was consciously operating within the breach-of-trust framework. *Id.* at 1151. "Rather than reflecting a misperception by the court of the Commission's operative theory of punishment, McClanahan's sentence properly measure[d] the contempt he exhibited for the terms and conditions of his release." *Id.*; *accord* Guidelines Manual ch. 7, pt. A, intro. 3(b) (contemplating that "the nature of the conduct leading to the revocation would be considered in measuring the extent of the breach of trust").

Indeed, Congress *requires* district courts to consider the nature of a defendant's supervised release violation to at least some extent. Before revoking a term of supervised release and imposing a new sentence, a district court must consider the sentencing factors set forth in 18 U.S.C. §§ 3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(4), (a)(5), (a)(6), and (a)(7). *See* § 3583(e). These factors are the nature and circumstances of the offense; the defendant's history and characteristics; the need to deter criminal conduct, protect the public, and provide the defendant with training, medical care, or other correctional treatment; sentencing recommendations and policy statements from the Sentencing Commission; the need to avoid unwarranted sentencing disparities among similar defendants; and the need for victim restitution. § 3553(a); *United States v. Carter*, 408 F.3d 852, 854 (7th Cir. 2005).

Although § 3583(e) does not tell courts to consider the sentencing factors listed in § 3553(a)(2)(A)—the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment—we have held that

district courts may consider those factors too, as long as they focus primarily on the factors that § 3583(e) does mention. *United States v. Clay*, 752 F.3d 1106, 1108 (7th Cir. 2014). As we observed in *Clay*, moreover, there is "significant overlap" between the factors listed in § 3583(e) and the factors in § 3553(a)(2)(A): "the 'nature' of a violation includes its 'seriousness,' and 'promot[ing] respect for the law' is a means of deterring future violations." *Id.* at 1108–09 (alteration in original) (citations omitted).

In this case, we have little trouble concluding that the district court stayed in its lane and sentenced Dawson primarily for his breach of trust. From start to finish, the court anchored its sentencing explanation in Dawson's breach of the court's trust. It began by explaining that Dawson had "shown lack of respect for the conditions of supervised release" and court orders by "driving around [in] the middle of the night with a hijacked electronic surveillance gadget attached to a battery." It carried that theme forward when discussing his failure to make restitution payments. "[Restitution] was part of the Court's order and should have been respected. It was not." The court used similar language when discussing the firearm violation, even if it also focused heavily on the seriousness of the violation and the threat to public safety. The court described Dawson's "possession of a killing machine like a 9mm semiautomatic Glock with an extended cartridge" while on supervised release as both an "affront to the court" and "a danger to the community." The violation "shows that [Dawson] lacks any real interest in rehabilitation." In the end, it was "too dangerous of conduct for the Court to do anything but impose a significant custodial sentence," and the court "enter[ed] a sentence above the guidelines for that reason."

Read as a whole, the sentencing transcript shows that the court properly considered the seriousness and dangerousness of the firearm violation within a breach-of-trust framework. There is no doubt that the court knew of the legal authority that informed its discretion. Both parties discussed the breach-of-trust theory at sentencing and the court asked Dawson a poignant follow-up question about it. Breach-of-trust language pervaded the court's sentencing explanation. As in *McClanahan*, the court's consideration of the seriousness of Dawson's firearm violation did not "reflect[] a misperception by the court of the Commission's operative theory of punishment"—instead, it "properly measure[d] the contempt he exhibited for the terms and conditions of his release." *McClanahan*, 136 F.3d at 1151. After all, the court had express congressional authorization to base its sentence on the nature of Dawson's violations and the need to protect the public from his future crimes. 18 U.S.C. § 3583(e); § 3553(a)(1), (a)(2)(C).

Dawson relies heavily on the district court's remarks at the preliminary revocation hearing. To be sure, the court suggested at that hearing that its potential punishment for the firearm violation might come in lieu of any state-court punishment in the pending firearm case. But the court made those comments nearly two months before imposing its sentence, in the context of asking the government whether it wished to proceed with proving the firearm violation. Those remote comments, though perhaps ill-advised, did not somehow infect the court's eventual sentence with error, especially when the court repeatedly displayed its knowledge of the breach-of-trust theory of punishment while sentencing Dawson. Dawson also criticizes the court's factual finding at the final revocation hearing that he possessed the firearm. But he does

not argue that the finding was clear error. Absent clear error, we will not touch the district court's factual findings. *United States v. Falls*, 960 F.3d 442, 445 (7th Cir. 2020).

At the end of the day, the line between punishing a defendant's breach of trust and punishing a violation on its own terms is not as clear as Dawson wants it to be. A serious violation correlates to a severe breach of trust, so a court *should* consider the nature of a violation when choosing its revocation sentence. *See McClanahan*, 136 F.3d at 1151. Doing so also comports with Congress's design for revocation sentences. On one hand, Congress told courts to consider various factors, including the nature and circumstances of a violation and the corresponding need to protect the public, before choosing a sentence. 18 U.S.C. § 3583(e); § 3553(a)(1), (a)(2)(B). At the same time, Congress set relatively low statutory caps—tied to the original crime of conviction—to ensure that the penalty for a supervised release violation would remain proportionate to the crime that landed the defendant in prison in the first place. § 3583(e)(3). Here, the district court knew of this legal framework and operated firmly within it. There was no error.

## B. Sentencing Factors and Mitigation Arguments

Dawson's next contention is that the district court ignored his mitigation arguments and the pertinent § 3553(a) factors by focusing almost exclusively on the punishment (or lack thereof) that he would receive in the pending state-court case. We review de novo whether the court procedurally erred by failing to consider the relevant sentencing factors and mitigation arguments. *See Karst*, 948 F.3d at 864.

As we have said, § 3583(e)(3) requires the district court to consider certain § 3553(a) factors before revoking a

defendant's supervised release and imposing a new sentence. A district court "need not make factual findings on the record for each factor," but "the record should reveal that the court gave consideration to those factors." *Carter*, 408 F.3d at 854. "We require only that the district court '*say something* that enables [us] to infer that [it] considered' the U.S. Sentencing Guidelines policy statements and the 18 U.S.C. §§ 3553(a) & 3583(e) sentencing factors." *Raney*, 842 F.3d at 1043 (emphasis and alterations in original) (quoting *United States v. Ford*, 798 F.3d 655, 663 (7th Cir. 2015)). "The district court 'need not consider the Section 3553 factors in check-list form.'" *Id.* (quoting *Ford*, 798 F.3d at 663).

The record reflects that the district court adequately examined the relevant sentencing factors. The court considered the "nature and circumstances of the offense" when discussing the circumstances surrounding Dawson's drug-testing, electronic-monitoring, and firearm violations. § 3553(a)(1). The court considered Dawson's "history and characteristics" and the need for victim restitution when discussing Dawson's financial situation and failure to make restitution payments. § 3553(a)(1), (7). The court considered the need to protect the public from Dawson's future crimes, remarking on the "danger to the community" posed by the firearm violation. § 3553(a)(2)(C). The court also considered the Sentencing Commission's sentencing recommendations and policy statements, as shown by its follow-up question about Dawson's breach-of-trust argument and its reasoned decision to depart from the Guidelines range. § 3553(a)(4)–(5). Finally, as Dawson recognizes, the court considered (but did not place too much weight on) the need for the sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." §

3553(a)(2)(A); *Clay*, 752 F.3d at 1108. We are satisfied that the court weighed the relevant factors. The court was not required to walk through each factor in check-list form. *Raney*, 842 F.3d at 1043.

As for mitigation, while the Seventh Circuit has "long held that district courts are required to directly address a defendant's principal arguments in mitigation that have legal merit," it has "never explicitly held that courts have the same strict duty at revocation proceedings, which are more informal than initial sentencing hearings." *United States v. Williams*, 887 F.3d 326, 328 (7th Cir. 2018). Rather, a defendant is entitled to present mitigation arguments at a revocation hearing, and district courts must approach revocation hearings "with an open mind and consider the evidence and arguments presented before imposing punishment." *Id.* (quoting *United States v. Hollins*, 847 F.3d 535, 539 (7th Cir. 2017)).

The district court adequately considered Dawson's mitigation arguments. At the final revocation hearing, Dawson's counsel asked the court to consider the "positive" aspects of Dawson's life: he was working long hours to provide for his girlfriend and his niece, and he and his girlfriend were expecting a child together. The court implicitly acknowledged Dawson's mitigation arguments when commenting that it was a "hardship" for Dawson to use his "hard-earned money" to pay restitution. And nothing in the record suggests that the court did not approach Dawson's arguments with an open mind and consider them before imposing its sentence. Indeed, the court seemingly changed its mind about Dawson's missed drug tests, concluding in the end that they were a "technical violation." So, it seems the court had an open mind before

imposing its sentence. Nothing more was required. *Williams*, 887 F.3d at 328.

Finally, there is no basis for Dawson's contention that the court based its sentence on its predictions about what would happen in the pending state-court case. The court commented on the potential state-court punishment two months before sentencing Dawson, while questioning the government about whether it was going to present testimony on the firearm violation. The court did not repeat those comments at the final revocation hearing. We do not interpret the court's comments as part of its sentencing explanation.

**C. Reasonableness of the Sentence**

Procedural issues aside, Dawson attacks his sentence on the merits. Dawson repurposes many of his earlier arguments to explain why the sentence was plainly unreasonable. His only new argument is that the court improperly disregarded the sentencing recommendations of the government and probation.

The standard for reviewing revocation sentences "presents an uphill battle" for Dawson. *United States v. DuPriest*, 794 F.3d 881, 884 (7th Cir. 2015). The Court's "review for substantive reasonableness is 'highly deferential' and we will reverse only if the sentence is 'plainly unreasonable.'" *United States v. Durham*, 967 F.3d 575, 580 (7th Cir. 2020) (quoting *United States v. Boultinghouse*, 784 F.3d 1163, 1177 (7th Cir. 2015)). "District courts have 'more than the usual flexibility in this context.'" *Id.* (quoting *United States v. Berry*, 583 F.3d 1032, 1034 (7th Cir. 2009)).

Judged against this permissive standard of review, the district court's 24-month sentence was not plainly unreasonable.

The Sentencing Commission's policy statements on revocation sentences are non-binding. *Raney*, 842 F.3d at 1044. Their purpose is to inform, rather than cabin, a judge's discretion. *Id.* Here, the court determined that the recommended range of 6 to 12 months did not reflect the seriousness of the firearm violation. Against the backdrop of the "wave of gun violence" in Chicago, the court described Dawson's possession of a loaded semiautomatic handgun with an extended magazine as an "egregious" violation that was "beyond the realm." The court's judgment that the severity of the firearm violation— on top of Dawson's other four violations, including his tampering with an electronic-monitoring device—justified an above-Guidelines sentence was not plainly unreasonable. In *United States v. Salinas*, we upheld a 24-month sentence, which far exceeded the Guidelines range of 3 to 9 months, because the Guidelines range "arguably did not reveal the complete story of the conduct underlying [the defendant's] violations," including his "aggressive, violent behavior." 365 F.3d 582, 589–90 (7th Cir. 2004). And in *Durham*, we upheld a district court's sentence at "more than double the high-end of the advisory range" because it "was entirely consistent with its assessment of the gravity of [the defendant's] conduct, the need to protect the public, and the judge's determination that a serious sentence was necessary to deter [the defendant] from future violations." 967 F.3d at 580. The same follows here: the court permissibly concluded that the advisory range did not reflect the gravity of Dawson's five violations, one of which involved possessing a loaded semiautomatic handgun with an extended magazine.

Contrary to what Dawson seems to believe, nothing required the court to follow the recommendations of the government and probation. Probation officers' sentencing

recommendations do not bind district courts. *United States v. Schuler*, 34 F.3d 457, 461 (7th Cir. 1994). The same is true for the parties' sentencing recommendations. In *United States v. Allgire*, for example, the defendant and the government recommended revocation sentences of 8 and 9 months, respectively. 946 F.3d 365, 367 (7th Cir. 2019). We upheld the district court's 24-month sentence because the court "clearly explained the variance decision with reference to the applicable sentencing factors, which were reasonably applied." *Id.* So too here. The court's decision to exceed the recommendations of probation and the government was not plainly unreasonable because the court grounded its decision in the relevant § 3553(a) factors.

### III. Conclusion

The district court did not err, procedurally or substantively, in sentencing Dawson to 24 months of prison for violating the conditions of his supervised release.

AFFIRMED.