In the

# United States Court of Appeals

## for the Seventh Circuit

_____

No. 24-2687

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

STEVEN BRADFORD,

*Defendant-Appellant.*

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 20-CR-413 — **Steven C. Seeger**, *Judge.*

_____

ARGUED DECEMBER 16, 2025 — DECIDED MARCH 18, 2026

_____

Before BRENNAN, *Chief Judge*, and SYKES and TAIBLESON,
*Circuit Judges*.

SYKES, *Circuit Judge*. Steven Bradford appeals from an
order revoking his supervised release and returning him to
prison for 36 months—the maximum reimprisonment term
and well above the advisory range under the Sentencing
Guidelines. Bradford challenges the 36-month term, arguing
that the district judge relied too heavily on the seriousness of

his supervised-release violations and not enough on the Guidelines range and policy statements.

This argument is meritless. District judges have wide discretion and considerable flexibility in revocation proceedings. Appellate review is highly deferential, and it's not our role to reweigh the factors the judge considered most relevant to the choice of a revocation sentence. The judge adequately explained his decision to impose a 36-month term of reimprisonment and justified it by reference to permissible factors. We affirm the judgment.

## I. Background

Bradford was indicted in 2005 in the Northern District of Iowa for conspiracy to distribute heroin and related charges arising from his participation in a heroin-trafficking ring that caused the overdose death of a teenager. He pleaded guilty to the conspiracy count and was sentenced to 210 months in prison and 60 months of supervised release. Bradford completed his custodial sentence in July 2020, and jurisdiction over his case was transferred to the Northern District of Illinois for the purpose of overseeing his supervised release in that district.

In December 2021 Bradford was arrested and charged in Cook County Circuit Court with unlawfully possessing a firearm as a felon and driving with an open container of alcohol in violation of Illinois law. In the wake of this arrest, his federal probation officer sought revocation of his supervised release because he had violated several court-imposed conditions—including, as relevant here, conditions requiring him to refrain from committing crimes or possessing a firearm.

The district court put the revocation proceedings on hold to allow the state-court case to proceed. A state judge released Bradford on bond, and in August 2022 he was arrested again—this time for drag racing while drunk, causing the death of an innocent motorist. More specifically, a police officer in the Chicago suburb of Oak Lawn observed a gray Dodge Charger drag racing a red Honda at a high rate of speed late at night. The race ended in a multi-vehicle crash. Several uninvolved vehicles were hit; a passenger in one of these cars was killed and two others were seriously injured.

Bradford was the driver of the Dodge Charger. He told the arresting officer that he had been drinking at a nearby bar just before the race. Test results showed that he was quite drunk: his blood-alcohol level was .135, well above the legal limit.

Significant state charges followed. The Cook County State's Attorney's Office indicted Bradford for reckless homicide, drag racing, aggravated driving while under the influence of alcohol causing death, and additional counts of aggravated driving while intoxicated causing bodily harm. His federal probation officer again sought revocation of his supervised release, citing his violation of conditions requiring him to refrain from committing crimes, using alcohol, or frequenting bars.

After this second arrest and revocation report, the federal proceedings restarted. The district judge held a hearing at which Bradford admitted some of the violations stemming from the two arrests. After hearing testimony from the Oak Lawn police officer who had witnessed and investigated the drunken drag race, the judge found that Bradford had committed the remaining violations we've just mentioned.

Before the hearing the probation officer submitted a presence report reflecting the 36-month statutory maximum term of reimprisonment and an advisory Guidelines reimprisonment range of 8 to 14 months based on the most serious violations—Grade B—and Bradford's criminal-history category of III. Without objection from the parties, the judge adopted the presence report's calculations. Bradford's counsel, joined by the probation officer, recommended reimprisonment of 14 months, the upper end of the Guidelines range. The government argued for the statutory maximum of 36 months.

The judge then engaged in a lengthy evaluation of the factors relevant to the reimprisonment decision as specified in 18 U.S.C. § 3583(e), which cross-references § 3553(a). He began by explaining that "[t]his is maybe one of the most lopsided records I've ever seen. There are lots and lots of aggravating factors." The judge's remarks focused primarily, though not exclusively, on the number and severity of Bradford's violations of the conditions of supervised release and the significance of his criminal history.

Regarding the 2021 violations, the judge commented on the seriousness of Bradford's conduct and how quickly he had reoffended after his release: "You got out of prison on July 8, 2020, and you were arrested with a handgun on December 17, 2021. A loaded handgun with a bullet in the chamber. … It's a profound violation of the terms of supervised release. It's a very serious violation that took place way too soon."

Turning to the 2022 violations, the judge explained that Bradford had engaged in a high-speed, drunken drag race that ended in a multi-vehicle crash, killing an innocent person and leaving two others with life-changing injuries. The judge

commented: "You were roaring down the streets speeding, intoxicated," and as a result, "[o]ne person is no longer here" and "two people [were] seriously injured, never going to be the same." The judge explained that while he had not found Bradford responsible for the fatality, his conduct was nonetheless "horrible," and it occurred while he was on federal supervision *and* state release on bond for the firearm arrest.

The judge also commented that he was "not impressed" with Bradford's criminal history and expressed concern that he had not "learned [his] lesson after 210 months" in prison for the heroin-trafficking conviction. The judge then took note of the fact that Bradford's drug-dealing conspiracy had caused the overdose death of a teenager. In this part of his analysis, the judge read from the victim-impact statements submitted by the victim's parents in which they described the devastating loss of their son.

Moving on, the judge summarized his already-stated views on the severity of Bradford's violation conduct and criminal history, and briefly touched on the need for deterrence and protection of the public. He also discussed the Guidelines range of 8 to 14 months and explained that he had reviewed the probation officer's presentence report "both for aggravating factors and mitigating factors." But he said that he did not see "a lot of mitigating factors" and that any mitigating factors were "substantially outweighed by all the aggravating factors."

The judge then revoked Bradford's supervised release and imposed a 36-month term of reimprisonment, the statutory maximum. This appeal followed.

## II. Discussion

A district judge may revoke an offender's term of supervised release and impose a term of reimprisonment after finding by a preponderance of the evidence that the offender has violated the conditions of his supervised release. *See generally* § 3583(e)(3). Bradford does not challenge the revocation decision; he focuses solely on the 36-month term of reimprisonment. He argues that the judge gave too much weight to the seriousness of his supervised-release violations—especially his conduct in connection with the drag-racing accident—and too little weight to the Guidelines' policy statements, the advisory sentencing range, and the recommendation of his probation officer. More generally, he argues that the judge's choice to impose the maximum term of reimprisonment disregarded the "breach of trust" theory of supervised-release revocation.

The Sentencing Commission has issued policy statements classifying supervised-release violations by level of seriousness—Grades A through C—and establishing advisory sentencing ranges that increase based on the seriousness of the violation and the defendant's criminal history score. *See generally* U.S.S.G. ch. 7C. As relevant here, the policy statements also explain that the Commission has endorsed a "breach of trust" theory of revocation sentencing that centers on sanctioning the offender "for failing to abide by the conditions of the court-ordered supervision" rather than treating the conduct that triggered revocation as if it were "new federal criminal conduct." U.S.S.G. ch. 7, pt. A, introductory cmt. 3(b). To that end, the policy statements advise district judges to "sanction primarily the defendant's breach of trust, while taking

into account, to a limited degree, the seriousness of the under-
lying violation and the criminal history of the violator." *Id.*

It has long been understood, however, that the Guidelines
range and policy statements are just recommendations; they
are nonbinding and meant to inform rather than limit judicial
discretion in revocation proceedings. *United States v. Dawson*,
980 F.3d 1156, 1162 (7th Cir. 2020). Still, in keeping with the
Commission's "breach of trust" theory, our cases have recog-
nized that revocation of supervised release is not meant to
"punish a defendant's violation as if it were a new federal
crime, but rather to sanction the defendant's breach of the
court's trust—that is, his or her failure to comply with court-
ordered conditions arising from the original conviction." *Id*.

It's also true, however, that district judges have particu-
larly broad discretion when revoking supervised release.
"[W]e give greater deference to a sentencing court revoking
supervised release than we do to a court imposing a sentence
for an original offense." *United States v. Snake*, 140 F.4th 379,
384 (7th Cir. 2025). Even before the Supreme Court's decision
in *Booker* made the Sentencing Guidelines advisory for all pur-
poses,[1] "sentencing courts had more than [the] usual flexibil-
ity [when] applying the Sentencing Commission's
recommended policy statements in the revocation context."
*Id.* (quotation omitted). Accordingly, appellate review of
supervised-release revocation is especially deferential. *Id.*

In addition to these general principles, we've also ex-
plained that emphasizing the seriousness of the defendant's
supervised-release violations is entirely consistent with the
"breach of trust" theory of revocation proceedings. *Dawson*,

---

[1] *Booker v. United States*, 543 U.S. 220 (2005).

980 F.3d at 1162. After all, "a more serious violation likely re-
flects a more serious breach of trust." *Id.* "Indeed, Congress
*requires* district courts to consider the nature of a defendant's
supervised release violation to at least some extent." *Id.* More
specifically, to determine the length of a reimprisonment
term, § 3583(e) instructs judges to consider a subset of the
§ 3553(a) factors that govern the court's initial sentencing de-
cision—specifically, § 3553(a)(1) (the nature and circum-
stances of the offense and the defendant's history and
characteristics); § 3553(a)(2)(B) (the need for deterrence);
§ 3553(a)(2)(C) (the need to protect the public); § 3553(a)(2)(D)
(the defendant's need for training, medical care, or correc-
tional treatment); § 3553(a)(4)–(5) (the applicable Guidelines
range and pertinent policy statements); § 3553(a)(6) (the need
to avoid unwarranted sentence disparities); and § 3553(a)(7)
(restitution). We've held that the nature and circumstances of
the defendant's violations of supervised release fit comforta-
bly within these statutory factors. *Dawson*, 980 F.3d at 1162–
63; *United States v. McClanahan*, 136 F.3d 1146, 151 (7th Cir.
1998).

Accordingly, weighing the seriousness of the defendant's
supervised-release violations "comports with Congress's de-
sign for revocation sentences." *Dawson*, 980 F.3d at 1164. And
doing so is not inconsistent with the Commission's "breach of
trust" theory of supervised-release revocation. On the con-
trary, "[a] serious violation correlates to a severe breach of
trust, so a court *should* consider the nature of a violation when
choosing its revocation sentence." *Id.*

Returning now to Bradford's case, he has not framed his
argument as a claim of procedural error. He does not contend
that the judge violated § 3583(e), miscalculated the Guidelines

range, or failed to explain the reasons for his choice of a reim-prisonment term. And we note more specifically that he has not raised a claim of *Esteras* error.

In *Esteras v. United States*, 606 U.S. 185 (2025), the Supreme Court considered the extent to which district courts may con-sider § 3553(a)(2)(A) when imposing a term of reimprison-ment after revoking a defendant's supervised release. As we've just explained, § 3583(e), which governs supervised-release revocation, requires district courts to consider many of the § 3553(a) factors that apply to the initial sentencing de-cision—but not all. Absent from the list is § 3553(a)(2)(A), which directs district courts to consider "the need for the sen-tence imposed to reflect the seriousness of the offense, to pro-mote respect for the law, and to provide just punishment."

As the Court explained in *Esteras*, this subsection of § 3553(a) encompasses the core "retributive purposes" of criminal sentencing. 606 U.S. at 192. Before *Esteras*, a circuit split had arisen regarding the extent to which district courts may consider § 3553(a)(2)(A) in supervised-release revocation proceedings. *Id.* at 190 n.1. *Esteras* resolved the conflict, hold-ing that the "natural implication" of the omission of § 3553(a)(2)(A) from the § 3583(e) list is that Congress did not intend for courts to consider it. *Id.* at 195. It follows, the Court concluded, that district courts may *not* consider § 3553(a)(2)(A) when revoking supervised release. *Id.*

Importantly, the Court addressed "*only* whether § 3583(e) precludes the court from considering retribution *for the under-lying criminal conviction*" when revoking supervised release. *Id.* at 194 n.5 (emphases added). The Court emphasized that it took no position on a separate debate between the parties about the extent to which the statute authorizes district judges

to consider "retribution *for the violation of the conditions of the supervised release*." *Id.*

*Esteras* was decided on June 20, 2025, the date on which Bradford's reply brief was due. In his opening brief, he did not make an *Esteras*-type argument that the district judge impermissibly considered § 3553(a)(2)(A). That is, he did not argue that the judge impermissibly considered retribution for his underlying criminal offense in imposing the 36-month term of reimprisonment. He did not file a reply brief; nor did he respond to the government's Rule 28(j) letter flagging the Court's decision in *Esteras*. Oral argument confirmed that Bradford is not raising an *Esteras* claim.

Instead, his challenge to the 36-month term is best understood as a claim of substantive error. He maintains that the judge gave short shrift to the Guidelines and the recommendation of his probation officer and overweighted the seriousness of his supervised-release violations, effectively "ignoring" the "breach of trust" theory of supervised-release revocation. This is a challenge to the substance of the judge's decision—i.e., the weight he assigned to permissible § 3553(a) factors.

Substantive review of a reimprisonment decision is "highly deferential." *United States v. Durham*, 967 F.3d 575, 580 (7th Cir. 2020) (quotation omitted). We will reverse only if the term of reimprisonment is "plainly unreasonable." *Id.* (quoting *United States v. Boultinghouse*, 784 F.3d 1163, 1177 (7th Cir. 2015)); *see also United States v. Childs*, 39 F.4th 941, 945 (7th Cir. 2022).

Reviewed against this lenient standard, Bradford's 36-month term of reimprisonment is easily affirmed. To repeat,

it's well understood that the Guidelines range and policy statements are merely recommendations. It's also well established that "[p]robation officers' sentencing recommendations do not bind district courts." *Dawson*, 980 F.3d at 1166. And as we've already explained, our cases hold that § 3583(e) permits courts to consider the seriousness of an offender's supervised-release violations. *Id.* at 1164. Finally, district judges have even broader discretion and flexibility in the context of supervised-release revocation than they do in their original sentencing decisions. *Snake*, 140 F.4th at 384. This ample discretion includes the option to reject a Guidelines range that, in the court's judgment, does not adequately reflect the gravity of the offender's violations or the need for deterrence and public protection. *Durham*, 967 F.3d at 580.

In accordance with these principles and on this record, the judge's imposition of the maximum term of reimprisonment was well within his discretion. It certainly cannot be said that the 36-month term is plainly unreasonable.

AFFIRMED